# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                   **Hearing Room    301**

---

2:30 PM
**1:17-12434    Robin DiMaggio**                                              **Chapter 7**
Adv#: 1:17-01099        Dachev et al v. DiMaggio

**#24.00**    Plaintiff's motion for summary judgment or, in the alternative,
partial summary judgment

fr. 10/3/18

Docket        40

**Judge:**

Grant in part and deny in part.

## I. BACKGROUND

### A.  *The Parties' Plan for a Charity Concert*

In December 2015, Peace For You Peace For Me (the "Foundation"), a nonprofit
organization registered under the laws of Bulgaria, contemplated organizing a charity
concert to raise money for and awareness of homeless and displaced children from
conflict zones worldwide (the "Charity Concert"). Declaration of Jay Botev ("Botev
Declaration") [doc. 41], ¶ 2.  The Foundation envisioned the Charity Concert as an all-
day, televised concert held in Sofia, Bulgaria on October 1, 2016 and modeled off
popular events such as 1985's Live-Aid and 2010's Hope for Haiti Now. Botev
Declaration, ¶ 3.  Around mid-2016, Krasimir Dachev became involved with the
Charity Concert and, through his company, Svilosa AD ("Svilosa"), financially
sponsored the Foundation. Botev Declaration, ¶ 2.

In May 2016, an individual named Vee Vee Saint Clair introduced Robin DiMaggio
("Defendant") to the Foundation. Botev Declaration, ¶ 4.  At that time, Defendant told
Jay Botev, the founded and a board member of the Foundation, that Defendant was a
well-known drummer and the "Musical Director of the United Nations." *Id*.
Defendant further represented to Mr. Botev that he had toured and recorded with
several music celebrities and emailed pictures of himself with these celebrities. *Id*.

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

---

**Wednesday, October 17, 2018**                                   **Hearing Room   301**

---

2:30 PM
**CONT...      Robin DiMaggio**                                                  **Chapter 7**

Defendant informed Mr. Botev that, through these connections, Defendant would be able to procure commitments from numerous celebrities to perform at the Charity Concert. *Id.*  Given that no one at the Foundation was familiar with the American music industry, the Foundation relied on Defendant's representations about deals and negotiations within the industry. *Id.*

Defendant initially stated that he would work with Bruce Sterling, who operated a company called A.E.I. Entertainment ("AEI"), and Ms. Saint Clair to enlist artists to perform at the Charity Concert. Botev Declaration, ¶ 5.  No one at the Foundation ever spoke with Mr. Sterling, and the Foundation did not authorize Defendant to make any payments to Mr. Sterling. *Id.*  Three weeks after their initial meeting, Defendant and the Foundation dropped Mr. Sterling and Ms. Saint Clair from their correspondence. *Id.*  Going forward, the Foundation dealt exclusively with Defendant. *Id.*

In June 2016, Defendant sent the Foundation an Artist Acquisition Roster (the "Roster"), which included the names of hundreds of well-known musicians worldwide. Botev Declaration, ¶ 6, Exhibit A.  Defendant informed the Foundation that it could select any of the musicians listed in the Roster and that Defendant would work to secure their performance at the Charity Concert. *Id.*

### B.  The Initial Deposits

On June 7, 2016, the Foundation and Defendant, through his wholly-owned company DiMaggio International Inc. ("DMI"), signed an Engagement Binder through which the Foundation agreed to wire $50,000 to DMI. Botev Declaration, ¶ 7, Exhibit B. The Engagement Binder included a provision that all artist fees paid to DMI would be applied to a different artist or returned if the original artist did not accept the offer to perform. *Id.*

On June 9, 2016, Defendant emailed Mr. Botev, among others, informing the Foundation that he received a "verbal Yes from Mick Jagger" and that Defendant had "sent all the correct calls to bring in the Big boys." Botev Declaration, ¶ 8, Exhibit C. On June 11, 2016, Defendant again emailed Mr. Botev, among others, informing the Foundation that he also received a "verbal Yes" from Earth, Wind & Fire. Botev Declaration, ¶ 8, Exhibit D.

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

**Wednesday, October 17, 2018**                    **Hearing Room    301**

<u>2:30 PM</u>
**CONT...      Robin DiMaggio**                                        **Chapter 7**

On June 30, 2016, Defendant sent another email to Mr. Botev, informing Mr. Botev that Defendant recently spoke to his manager, business manager, production team and lawyers and that they all came to the conclusion that they would need the remaining balance of $15,000 to move forward with securing artists. Botev Declaration, ¶ 9, Exhibit E. Defendant also warned Mr. Botev that failing to make the $15,000 payment would be "extremely dangerous" for the parties' reputations and that, upon receiving the $15,000 payment, Defendant could "lower the risk factor with [his] people." *Id.*

On July 7, 2016, Defendant forwarded an email to the Mr. Botev in which the sender, identified only as "J.F.," wrote to Defendant:

> Here is who verbally confirmed as per your last email a few hours ago,
> J. Depp, SIR Mick Jagger, Rod Stewart, Slash, Bruno Mars, Justin Timberlake,
> Please remember these are Verbal Yes but not Contracted as of yet.
> Please be careful and make sure you fund before we send out Paper Agreement or All this is for nothing.

Botev Declaration, ¶ 11, Exhibit G. As a result, the Foundation approved wiring approximately $41,000 to DMI's bank account. Botev Declaration, ¶ 10, Exhibit F.

Prior to the transfer of these funds from the Foundation to DMI, DMI's bank account had a balance of $343.40. Declaration of Douglas R. Painter ("Painter Declaration") [docs. 43, 50], ¶ 14, Exhibit GGG, p. 272. From June 21, 2016 through July 7, 2016, Plaintiffs deposited a total of $40,844 into DMI's account for the purpose of securing artists for the Charity Concert. *Id.*, pp. 272-75. Soon after each of these deposits, Defendant withdrew the funds from DMI's bank account. *Id.* Specifically, Plaintiffs deposited, and Defendant withdrew, the following sums:

| Date | Deposit/Withdrawal | Amount |
|------|--------------------|--------|
| June 21, 2016 | Deposit | $9,960 |
| June 27, 2016 | Deposit | $9,960 |
| June 27, 2016 | Withdrawal | $17,286.86 |
| June 28, 2016 | Withdrawal | $500 |

## United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                    **Hearing Room   301**

2:30 PM
CONT...        **Robin DiMaggio**                                                    **Chapter 7**

| June 29, 2016 | Withdrawal | $240 |
|---|---|---|
| June 30, 2016 | Withdrawal | $360 |
| July 1, 2016 | Withdrawal | $40 |
| July 5, 2016 | Deposit | $4,964 |
| July 5, 2016 | Withdrawal | $13,800 |
| July 7, 2016 | Deposit | $6,000 |

*Id*. From the initial deposit of $40,844, Defendant withdrew a total of $32,226.86. *Id*. Aside from withdrawing the $32,226.86, Defendant used DMI's debit card to make several purchases at gas stations, groceries and convenience stores, coffee shops, pet stores, hardware stores, restaurants, home furnishing stores, hotels, mobile carrier stores, auto shops and movie ticketing websites. *Id*.

Soon after withdrawing the funds from DMI's bank account, Defendant made deposits into his personal checking account. Painter Declaration, ¶ 14, Exhibit GGG, pp.122-26. On June 27, 2016, Defendant deposited $1,200 into his personal checking account and, on the same day, withdrew as cash $391 from his personal account. *Id*. On July 5, 2016, Defendant deposited another $13,216.47 into his personal checking account and, on the same day, withdrew a total of $7,367.45 in cash. *Id*. Defendant also made several personal purchases with his personal debit card, including a $1,319.51 telephone payment, several payments at restaurants and gas stations and a $96 charge at TJ Maxx. *Id*. Defendant also used $3,000 of the funds to pay his Barclays credit card. *Id*. Defendant used his Barclays credit card to make personal purchases for himself and his ex-wife, Marti Rich. Painter Declaration, ¶ 18, Exhibit KKK.

### C.  The $150,000 Deposit

Subsequently, Defendant, through DMI, sent the Foundation an Artist Acquisition Invoice requesting deposits of $100,000 to secure Mick Jagger and $50,000 to secure Earth, Wind & Fire. Botev Declaration, ¶ 12, Exhibit H.  Like the Engagement Binder, the Artist Acquisition Invoice included a provision that the funds would be applied to a different artist or returned to the Foundation if the artists were unavailable and did not accept the offer. *Id*.  On July 14, 2016, in response to Defendant's request, the Foundation approved a wire of $150,000 to DMI. Botev Declaration, ¶ 13, Exhibit I.

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

---

**Wednesday, October 17, 2018**                                      **Hearing Room   301**

---

2:30 PM
**CONT...      Robin DiMaggio**                                                    **Chapter 7**

On July 14, 2016, DMI received a $149,955 deposit from Plaintiffs into its account. Painter Declaration, ¶ 14, Exhibit GGG, p. 275.  Immediately after receiving the $149,955 deposit, Defendant withdrew $155,600 from DMI's account. *Id.*  On the same day, Defendant deposited $155,600 into his personal checking account. *Id.*, p. 126.  Upon depositing the $155,600 into his personal account, Defendant immediately made multiple cash withdrawals totaling $62,853.18. *Id.*  On July 15, 2016, the day after the transfer, Defendant made two payments to his Barclays credit card totaling $13,136.23. *Id.*  From July 15, 2016 through July 20, 2016, Defendant continued to withdraw substantial amounts of cash, totaling $38,101.84. *Id.*, pp. 126-28.  Defendant also continued to use his personal debit card for several personal expenses, including dining, car expenses, convenience store purchases and shopping at The Home Depot. *Id.*

The record is devoid of any evidence that Defendant used any of the funds deposited into DMI's account to secure Mick Jagger or Earth, Wind & Fire as performers at the Charity Concert.  In fact, according to Chris Andrews, a talent agent employed with Creative Artists Agency ("CAA"), CAA was the "exclusive" talent agency representing Mick Jagger in 2016 and 2017. Declaration of Chris Andrews ("Andrews Declaration") [doc. 44], ¶ 2.  On July 28, 2016, Mr. Andrews received an unsolicited email from "industrylevelsubmit@gmail.com" inquiring as to the availability of Mick Jagger to appear at a charity concert in Sofia, Bulgaria on October 1, 2016. Andrews Declaration, ¶ 3.  Mr. Andrews did not respond to this solicitation. *Id.*  On August 1, 2016, Mr. Andrews received another email from the same email address asking about Mick Jagger's availability on October 1, 2016. Andrews Declaration, ¶ 4.  On the same day, Mr. Andrews responded to the email stating that Mick Jagger was not available to appear at the event. *Id.*  According to Mr. Andrews, neither CAA nor any representative of Mick Jagger ever received deposits from Defendant, DMI, Mr. Sterling, AEI or any other entity attempting to secure Mick Jagger's performance at the Charity Concert. Andrews Declaration, ¶ 5.

In 2016 and 2017, CAA also was the exclusive talent agency representing Earth, Wind & Fire. Declaration of Brett Steinberg ("Steinberg Declaration"), ¶ 2.  Neither CAA nor any other representative of Earth, Wind & Fire entered into any agreements to appear in Sofia, Bulgaria for the Charity Concert. Steinberg Declaration, ¶ 3.  In addition, CAA does not have a record of any negotiations in 2016 or 2017 between

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

---

**Wednesday, October 17, 2018**                                            **Hearing Room   301**

---

**2:30 PM**
**CONT...      Robin DiMaggio**                                                         **Chapter 7**

Earth, Wind & Fire and Defendant, DMI, Mr. Sterling, AEI or any other entity
attempting to secure Earth, Wind & Fire's performance at the Charity Concert. *Id.*

### D.  The $53,300 Deposit

In early July 2016, the Foundation arranged a press conference in Sofia, Bulgaria to
publicize the Charity Concert. Botev Declaration, ¶ 14; Declaration of Alexander
Panev ("Panev Declaration"), ¶ 2.  After the press conference, local press reacted with
skepticism to the suggestion that the Charity Concert would be ready in time for the
October 1, 2016 concert date. *Id.*  After the press conference, Defendant, through
DMI, sent the Foundation an invoice (the "Defamation Invoice") requesting $53,300
to pay for "legal defamation PR," "legal attorney fees" and "administrative services."
Botev Declaration, ¶ 14, Exhibit J; Panev Declaration, ¶ 2, Exhibit CC.  The "legal
defamation PR" fees referred to "fees for legal defamation [to] secure public relations
for damage control due to false Media and public disclosed marketing towards artists
that have not legally been acquired by there [sic] agency to perform" at the Charity
Concert. *Id.*

On July 17, 2016, Alexander Panev, an associate and representative of Mr. Dachev,
emailed Defendant to discuss the Defamation Invoice. Panev Declaration, ¶ 3, Exhibit
DD.  In the email, Mr. Panev also instructed Defendant to use the funds already wired
to Defendant to finally secure the performances of Mick Jagger and Earth, Wind &
Fire. *Id.*  In response, Defendant requested an additional $52,000 and stated that he
could not secure Mick Jagger's performance without the additional funds. *Id.*
Defendant also stated: "Let me know if you can't or won't I completely understand I
will have to resign from the Venture and make a wire back to you. This is my Teams
decision and we will not budge." *Id.*

On July 18, 2016, Mr. Panev responded to Defendant and informed Defendant that the
Foundation had already paid $150,000 to secure Mick Jagger and Earth, Wind & Fire
as performers for the Charity Concert. *Id.*  Mr. Panev told Defendant that Defendant
could either secure the performers with the money he had or wire back the funds to
the Foundation. *Id.*  On the same day, Defendant emailed Mr. Panev and informed
him that he would wire back the funds and that the Foundation should hire someone
else to help organize the Charity Concert. *Id.*

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

---

**Wednesday, October 17, 2018**                                   **Hearing Room     301**

---

2:30 PM
**CONT...       Robin DiMaggio**                                                    **Chapter 7**

Nevertheless, on July 21, 2016, the Foundation approved a wire of $53,300 to DMI.
Botev Declaration, ¶ 15, Exhibit K.  On July 21, 2016, DMI received $53,300 into its
account. Painter Declaration, ¶ 14, Exhibit GGG, p. 275.  Immediately after receiving
these funds, Defendant withdrew $53,251 from DMI's account. *Id.*

On July 21, 2016, Defendant deposited $53,251 into his personal account, along with
two deposits of $267.51 and $2,300. Painter Declaration, ¶ 14, Exhibit GGG, p. 128.
From July 21, 2016 through August 8, 2016, Defendant made cash withdrawals
totaling $61,831.69. Painter Declaration, ¶ 14, Exhibit GGG, pp. 128-35.  Defendant
also continued to spend funds on personal expenses, including a $2,732.40 charge
described as "Classic Vacations," additional payments to Defendant's Barclays credit
card, multiple expenses at Starbucks, a $266 payment to Los Angeles Superior
Court's Traffic Department, a $509.03 charge at a restaurant, a $397.20 charge from
Delta Airlines, numerous grocery store, convenience store and gas station expenses, a
$305.16 charge at GameStop, several charges at chocolatiers and clothing stores and
multiple charges at Four Seasons hotels. *Id.*  Defendant also made a $18,358.88
payment to his American Express credit card. Painter Declaration, ¶ 14, Exhibit GGG,
p. 130.

### E.   The $750,000 Deposit

Defendant continued to request additional funds from the Foundation and claimed he
could secure additional artists. Botev Declaration, ¶ 16.  On July 31, 2016, Defendant
emailed Mr. Dachev to inform him of additional offers to perform at the Charity
Concert. Panev Declaration, ¶ 4, Exhibit EE.  In a series of emails, Defendant
informed Mr. Dachev that, with Mr. Dachev's permission, Defendant could "green
light" performances from Jennifer Lopez, Robbie Williams, Don Felder, Roger
Waters and Pink! *Id.*  In the same series of emails, Defendant also stated he had
confirmation that Blondie and the Beach Boys would perform for $250,000 each. *Id.*

On August 1, 2016, Defendant sent the Foundation a Deal Offer Form requesting a
deposit of $750,000 to secure Jennifer Lopez, Robbie Williams, Roger Waters, Don
Felder, Christina Aguilera and John Legend. Panev Declaration, ¶ 5, Exhibit FF.  The
Deal Offer Form was on a letterhead bearing the name One Talent Agency and did not
make any reference to Defendant or DMI. *Id.*  The Deal Offer Form provided that the
offer was set to expire on August 2, 2016, one day after the offer date. *Id.*  The Deal

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

---

**Wednesday, October 17, 2018**                                          **Hearing Room        301**

---

2:30 PM
**CONT...        Robin DiMaggio**                                                                **Chapter 7**

Offer Form did not include a provision that the funds furnished by the Foundation
would be returned to the Foundation if the artists were unavailable or did not agree to
perform at the Charity Concert. Panev Declaration, ¶ 6.

On August 1, 2016, Mr. Panev emailed a letter from Mr. Botev to Defendant, in which
Mr. Botev requested changes to the Deal Offer Form. Panev Declaration, ¶ 6, Exhibit
GG. Specifically, Mr. Botev requested that the Deal Offer Form provide for One
Talent Agency to be liable for their obligations in the Deal Offer Form and that the
Deal Offer Form contain a provision that the funds would be returned to the
Foundation in case any of the performances did not proceed as planned. *Id*.

On August 2, 2016, Defendant emailed Mr. Panev and noted that the Deal Offer Form
would expire at 5:00 p.m. on August 2, 2016 and, upon expiration, the parties would
"lose every artist[]." Panev Declaration, ¶ 7, Exhibit HH.  Defendant continued—

> He will need a signed copy and proof of wire.

> I absolutely do not want to put pressure on you and Kris but making
> sure every details are met so both sides feel completely comfortable.
> We are about to make History in Sofia.

*Id*.  Mr. Panev responded to Defendant, informing Defendant that the Foundation
would not move forward unless the parties amended the Deal Offer Form to provide
for a refund of the money paid by the Foundation in case of cancellation by an artist.
*Id*.  Defendant responded by writing, in relevant part—

> If an artist does not commit yes 100% the money goes back to Dachev.
> There is no other way but to make things 100% right at this point.

*Id*.  Defendant then promised to "track the production office down" and have them
amend the Deal Offer Form. *Id*.

On August 3, 2016, Defendant emailed Mr. Dachev and Mr. Panev with the subject
line "We are about to lose the deal read below." Panev Declaration, ¶ 8, Exhibit II.
The email appeared to be a forward from someone named Neil Epstein from One
Talent Agency. *Id*.  In the email, Mr. Epstein wrote—

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

---

**Wednesday, October 17, 2018**                                    **Hearing Room     301**

<u>2:30 PM</u>
**CONT...**       **Robin DiMaggio**                                                    **Chapter 7**

> I'm certain your [sic] aware your requests are unusual and management
> are having second thoughts… Please be aware that talent secures a date
> with a deposit before anymore negotiations continue…
>
> There fore [sic] if theres [sic] any other requests or 3rd party
> requests…
>
> We will have to close negotiations at this time… And pass on this
> event.
>
> Theres [sic] many moving parts moving to [sic] fast… Management
> will be concern [sic] if we have more red flags concerning this
> booking…
>
> Sorry but we never had these kinds of unusual requests…

*Id.*  Subsequently, Defendant emailed Mr. Panev an amended Deal Offer Form (the
"Amended Deal Offer") with the following language added—

> If the Artist is not available or does not accept your offer, Artist fees
> will be applied towards another artist(s) or returned if the artist
> declines or has a cancelation of performance
>
> Therefor [sic] Cancelation will constitute that the Purchaser
> responsibility to reimburse the Purchaser for full reimbursement of that
> specific Artist or Artist Fees.

Panev Declaration, ¶ 9, Exhibit JJ.  In his response to the Amended Deal Offer, Mr.
Panev informed Defendant that the Amended Deal Offer did not address all of the
Foundation's concerns and requesting another amended draft. *Id.*  Defendant agreed to
make the changes, but also told Mr. Panev to "[s]end [the] wire so we dont [sic] lose
them." *Id.*

On August 3, 2016, Mr. Panev emailed Defendant asking Defendant to send details
about One Talent Agency to Mr. Panev, including One Talent Agency's registration

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                    **Hearing Room       301**

---

**2:30 PM**
**CONT...       Robin DiMaggio**                                                    **Chapter 7**

number, address, representatives, bank account and contacts. Panev Declaration, ¶ 10, Exhibit KK. In response, Defendant told Mr. Panev that, if the Foundation decided to pay One Talent Agency directly, the Foundation would incur "33% taxes" on top of the payment and that the Foundation should instead pay DMI. *Id*.

On August 4, 2016, one day later, Defendant sent a new agreement to Mr. Panev, this time with DMI as the party instead of One Talent Agency (the "DMI Agreement"). Panev Declaration, ¶ 11, Exhibit LL. The DMI Agreement provided for $750,000 to be paid into DMI's escrow account to secure performances by Jennifer Lopez, Roger Waters, John Legend, Christina Aguilera, Robbie Williams and Don Felder. *Id*. Defendant did not explain to the Foundation why One Talent Agency was removed from the contract or how DMI would take over One Talent Agency's obligations. Panev Declaration, ¶ 11.

On August 4, 2016, Defendant again emailed Mr. Panev asking Mr. Panev to wire money to DMI's account and stating that "time is about to be against" the parties if Defendant does not show proof of payment. Panev Declaration, ¶ 12, Exhibit MM. On August 5, 2016, Defendant emailed Mr. Panev informing him that Defendant was "playing with Fire with management once again" and that the parties were "close to losing the deal." Panev Declaration, ¶ 13, Exhibit NN. In response, the Foundation informed Defendant that they would wire the $750,000 if Defendant explicitly confirmed that he would establish an escrow account upon Defendant's return to Los Angeles on August 10, 2016 and if Defendant would not use the money until it landed in the escrow account. *Id*. In response, Defendant told the Foundation that he "agree[d] to both terms explicitly." *Id*. After the Foundation again asked Defendant if he agreed to immediately fulfil the conditions upon his return to Los Angeles, Defendant responded by stating: "I agree 100% Confirmed." *Id*.

In light of Defendant's agreement, the Foundation sent Defendant an amendment to the DMI Agreement which incorporated the conditions requested by the Foundation (the "DMI Amendment"). Panev Declaration, ¶ 13, Exhibit OO. Defendant responded as follows—

> I am in the middle of Tasmania, there is no scanners. But on sun [I] will be able to sign whatever you need.
> Alex, stop delaying and asking for more.

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

2:30 PM
**CONT...**        **Robin DiMaggio**                                              **Chapter 7**

Please send the wire as pro[m]ised last night by Kris, his word is
immaculate towards me as Mine is towards him.
I am doing UN work right now and [I] already told all management
funds were sent.

I'm going to ask you kindly one last time to please send proof of wire.

I have done everything Kris has asked.
And pre warned escrow would be open latest by the 12th.

No more emails
Its [sic] time to engage.
Thank you for respecting.

*Id*.  Because of Defendant's representations that the agreements with several artists
would be "lost" without the wire and based on Defendant's promise to open an escrow
account, on August 5, 2016, the Foundation approved a wire of $750,000 to DMI.
Panev Declaration, ¶ 14.

On August 5, 2016, DMI received a $750,000 deposit into its account. Painter
Declaration, ¶ 14, Exhibit GGG, p. 277.  Four days later, on August 9, 2016,
Defendant withdrew $750,000 from DMI's bank account. *Id*.  On September 12,
2016, after using DMI's debit card to make additional purchases at restaurants,
Defendant closed DMI's bank account. Painter Declaration, ¶ 14, Exhibit GGG, p.
277-79.  At the time of closing, DMI had $87 left in its bank account. *Id*.

On August 9, 2016, the day Defendant withdrew $750,000 from DMI's bank account,
Defendant deposited $750,000 into his personal checking account. Painter
Declaration, ¶ 14, Exhibit GGG, p. 135.  On the same day, Defendant made a cash
withdrawal of $50,000. *Id*.  Throughout the month of August, Defendant continued to
make numerous cash withdrawals, totaling $305,790.19. Painter Declaration, ¶ 14,
Exhibit GGG, p. 135-43.

From the withdrawn $305,790.19, Defendant transferred $150,000 to an account in
the name of Dimagic Entertainment ("Dimagic"), a company wholly owned by
Defendant. Painter Declaration, ¶ 14, Exhibit GGG, p. 280; Painter Declaration, ¶ 22,

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

---

**Wednesday, October 17, 2018**                                    **Hearing Room      301**

---

**2:30 PM**
**CONT...       Robin DiMaggio**                                                          **Chapter 7**

Exhibit OOO.  Defendant formed Dimagic on July 29, 2016, eight days after receiving $53,300 from Plaintiffs and one week before receiving the $750,000 deposit from Plaintiffs. Painter Declaration, ¶ 22, Exhibit OOO.  In a Statement of Information filed with California's Secretary of State, Defendant indicated that he is Dimagic's Chief Executive Officer, Secretary and agent for service of process. *Id*.  Defendant did not list any other officers or directors. *Id*.  Defendant's deposit of $150,000 into Dimagic's account appears to be the first deposit into that account after Dimagic's formation. Painter Declaration, ¶ 14, Exhibit GGG, p. 280.

In August 2016, in addition to these cash withdrawals, Defendant also initiated an outgoing international wire transfer in the amount of $914.72 and a domestic wire in the amount of $251,370. Painter Declaration, ¶ 14, Exhibit GGG, pp. 136, 139. Defendant used the $251,370 to purchase real property located at 23777 Mulholland Highway, #163, Calabasas, California 91302 (the "Mulholland Property") allegedly for his ex-wife, Ms. Rich. Painter Declaration, ¶ 25, Exhibit PPP.  In fact, Defendant acknowledged at his deposition that he used the Foundation's money to purchase the Mulholland Property. Painter Declaration, ¶ 2, Exhibit TT, 319:2-7.

By this time, Defendant and Ms. Rich had been divorced for approximately four years. Painter Declaration, ¶ 2, Exhibit TT, 293:14-18.  According to Defendant, he did not have a court ordered or other legal obligation to pay support or alimony to Ms. Rich. Painter Declaration, ¶ 2, Exhibit TT, 295:20-23.  Nevertheless, Ms. Rich is listed as the buyer of the Mulholland Property. Painter Declaration, ¶ 25, Exhibit PPP.  In addition, Defendant made several payments on the Mulholland Property, including for the development on which the Mulholland Property is located and for utilities and taxes. Painter Declaration, ¶¶ 26-28, Exhibits QQQ-SSS.

Aside from the cash withdrawals and the purchase of the Mulholland Property, Defendant also depleted the funds by using his debit card for personal expenses. Painter Declaration, ¶ 14, Exhibit GGG, pp. 135-43.  In the month of August alone, Defendant made several "big ticket" purchases, such as $3,400 at "Wrap Labs, Inc.," $6,599.28 at Best Buy, $8,639 on automotive expenses, $3,436.53 at Cost Plus, $1,698.44 at John Varvatos, $6,401.22 at Guitar Center and DW Drums, $818.99 at "Psychic Eye Book Shops," $5,252 at "Archstone" and $3,466.08 at VC Defense. *Id*. Defendant also made over $19,000 in payments to several of his personal credit cards. *Id*.  Defendant further exhausted the funds by spending money at restaurants, bars,

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                                    **Hearing Room    301**

<u>2:30 PM</u>
**CONT...        Robin DiMaggio**                                                              **Chapter 7**

clothing stores, liquor stores, coffee shops, airports, pet stores, music stores, grocery
stores, hardware stores and jewelry stores. *Id.* The addition of $750,000 to
Defendant's checking account resulted in a balance of $752,697.25 as of August 9,
2016. *Id.* By the end of August, Defendant had whittled down that sum to
$60,896.77. *Id.*

Defendant continued to spend the funds through September and October of 2016.
Painter Declaration, ¶ 14, Exhibit GGG, pp. 146-66. During that time, Defendant
withdrew a total of $22,304.86 in cash from his account. *Id.* Defendant also
continued to make several debit card purchases, including for dental care, phone bills,
home furniture, clothing, hotels, air travel, electronics, restaurants and bars. *Id.*
Starting on September 20, 2016, Defendant began occasionally depositing funds into
his checking account. *Id.* At that time, Defendant deposited $10,000 into his account;
it is unclear if Defendant deposited previously withdrawn cash back into the account
or if Defendant obtained the funds from a source other than Plaintiffs. *Id.* Prior to the
$10,000 deposit on September 20, 2016, Defendant had a balance of $18,595.94
remaining in his account. *Id.*

Defendant continued to spend money and occasionally replenish funds. On November
30, 2016, after a deposit of $24,700, the origin of which is unclear, Defendant's
account reached a balance of $26,125.31. *Id.* After that, Defendant slowly drained the
account; by June 30, 2017, the last date of banking history available to the Court, the
account contained only $147.16.

In November 2016, Defendant made additional deposits into Dimagic's account.
Painter Declaration, ¶ 14, Exhibit GGG, p. 283. After those deposits, which brought
Dimagic's balance up to $197,580.79, Defendant began making several withdrawals
from Dimagic's account. *Id.* Beginning in December 2016, Defendant also began
using Dimagic's debit card to make personal purchases at restaurants, coffee shops,
retail stores, etc. Painter Declaration, ¶ 14, Exhibit GGG, pp. 285-86. From January
2017 through the petition date, Defendant continued to withdraw funds from
Dimagic's account and use Dimagic's debit card for personal expenses. Painter
Declaration, ¶ 14, Exhibit GGG, pp. 287-313. On the petition date, Defendant had
$68.66 left in Dimagic's account. Painter Declaration, ¶ 14, Exhibit GGG, p. 313.

### F.  *Plaintiffs' Demand for Repayment*

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

<u>2:30 PM</u>
**CONT...        Robin DiMaggio**                                              **Chapter 7**

On August 10, 2016, Defendant emailed Mr. Dachev, informing him that "an entire group of managers" felt that the Charity Concert should be postponed to December 1, 2016 "[b]ecause of the [M]ick Jagger incident." Panev Declaration, ¶ 15, Exhibit PP. Defendant continued—

> However here are the 2 choices black and white.
> We speak we move it to Dec first weekend gives us more time or I get the deposits back and send you moneys back.
>
> The other situation was the Agreement was until aug 3rd and I didnt [sic] get your signature to show them proof until the 4th or 5th. They dont [sic] operate the same way as they do in Europe for deadlines. For me it didnt [sic] matter but for the brokerage firm they took that as an insult.

*Id*. In response, Mr. Panev informed Defendant that if it was "impossible to manage [the Charity Concert] as planned," Defendant should inform the Foundation and return the funds to the Foundation. *Id*. Throughout this email chain, Mr. Panev continued to request that Defendant sign and return the DMI Amendment. *Id*.

On August 16, 2016, Defendant emailed Mr. Dachev informing him that managers representing Lenny Kravitz, Alicia Keys, Earth, Wind & Fire and Calvin Harris contacted Defendant asking why "idiots from Bulgaria" would prevent the Charity Concert from moving forward in December instead of October. Panev Declaration, ¶ 16, Exhibit QQ. After blaming the Foundation for the deals falling apart, Defendant informed the Foundation that there was nothing else Defendant could do to save the show. *Id*. In response to this email, the Foundation emailed Defendant stating: "Just for the record: still no Amendment despite… your promise; still no escrow account despite… the agreement and your promise; still no artist engaged despite… your promise and despite all that money we sent you." *Id*. The Foundation also asked Defendant to "wire all the money back immediately." *Id*. To this, Defendant emailed the Foundation stating he would wire the money back to the Foundation "[a]s soon as everyone returns the deposits." *Id*.

On August 24, 2016, the Foundation again emailed Defendant requesting a return of

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                   **Hearing Room    301**

2:30 PM
**CONT...**       **Robin DiMaggio**                                              **Chapter 7**

the funds deposited into DMI's bank account. Panev Declaration, ¶ 17, Exhibit RR.
The next day, Defendant responded to the Foundation as follows—

> I just talked to Kris last night and he knows we are keeping the funds
> until [Wednesday] when [I] have new contracts for June 1st.
> Please let me know if myself or you are mis communicating [sic]?

*Id*. Despite Defendant's contention that there were new contracts for June 2017, both
Mick Jagger's and Earth, Wind & Fire's talent agents testified that neither artist had
been secured for a June 2017 concert. Andrews Declaration, ¶ 5; Steinberg
Declaration, ¶ 3.

On September 2, 2016, the Foundation sent another email to Defendant requesting a
return of the funds and itemizing the deposits sent to the DMI's bank account. Panev
Declaration, ¶ 18, Exhibit SS.  On the same day, Defendant responded—

> What are you talking about?
> The results were in [Wednesday].
> And he didn't tell me what he wanted,
> I sent deposits to Artists as agrees [sic].
> You guys are something else.
> Is there that much of a communication break down [sic]?
> Or is your English that bad?
> And I'm simply not understand [sic] you?

*Id*.  In response, the Foundation informed Defendant that "[i]f [he has] sent the
deposits to Artists [he has] done it without Mr. Dachev's consent." *Id*.  To date,
Defendant has not returned any of the funds deposited into DMI's bank account.
Panev Declaration, ¶ 18.

### G.  Additional Expenses Incurred by Plaintiffs

In addition to the Foundation's transfer of funds detailed above, the Foundation also
paid Defendant $5,000 in travel expenses and $4,000 in cash to fund Defendant's trip
to Sofia, Bulgaria. Botev Declaration, ¶¶ 18, 32, Exhibit BB.  The Foundation also
incurred additional out-of-pocket expenses in preparation for the Charity Concert.

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

2:30 PM
CONT...        Robin DiMaggio                                                          Chapter 7

Botev Declaration, ¶ 18.  These expenses included: (A) $5,185 to Virgin Records,
Ltd./Abbey Road Studios for use of a music studio; (B) $6,675 to Dimiter Marinov,
who was hired to be one of the masters of ceremony at the Charity Concert; (C)
$2,500 to T-YPO Talent Agency to secure Neve Gachev as one of the masters of
ceremony; (D) $2,374 to a composer of a song to be performed at the Charity Concert;
(E) $13,822 to Studio Blend for 3D mapping and graphic design for the Charity
Concert; (F) $11,519 to Dinacord for scene design, sound engineering, lights and
additional logistics for the Charity Concert; (G) $3,643 to Kamen Kamenov for
accounting services for the Charity Concert; (H) $83,102 to secure National Levski
Stadium as the venue for the Charity Concert; (I) $15,870.08 to The New Act to
secure flight tickets for the Charity Concert; (J) $3,800 to the Grand Hotel Sofia for
accommodations in connection with the Charity Concert; (K) $671 to the Central Park
Hotel for accommodations in connection with the Charity Concert; and (L) $2,142 to
Sky Fly for flight tickets for the Charity Concert. Botev Declaration, ¶¶ 18-19, 22-31,
Exhibits N-O, R-AA.

In his declaration, Mr. Botev also states that the Foundation paid Ms. Saint Clair
$96,030 to secure Bob Geldof, Rick Astley and Matt Lawrence for the Charity
Concert as well as for catering and other expenses. Botev Declaration, ¶ 20, Exhibit P.
Mr. Botev also testified that the Foundation paid $25,000 to an individual named
Krassimir Kourtev, but did not explain how this payment was used in preparation for
the Charity Concert. Botev Declaration, ¶ 21, Exhibit Q.  The attached invoice to Mr.
Kourtev does not provide additional clarification. *Id*.

### H. The State Court Action

Prepetition, Plaintiffs sued Defendant and DMI in state court (the "State Court
Action"). SUF, ¶ 25; Painter Declaration, ¶ 1.  In connection with the State Court
Action, DMI filed a countercomplaint against Plaintiffs and attached purported emails
between Mr. Dachev and Defendant (the "State Court Emails"). Painter Declaration, ¶
4, Exhibit VV.  In the email exchange, Mr. Dachev appears to agree that Defendant
should keep the funds wired by Plaintiffs to DMI and to apply the funds towards
securing performances for a June concert. *Id*.

During the State Court Action, Defendant also claimed that he sent $600,000 of
Plaintiffs' money to Mr. Sterling. SUF, ¶ 26; Painter Declaration, ¶ 6, Exhibit XX.  To

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

**2:30 PM**
**CONT...        Robin DiMaggio**                                                    **Chapter 7**

support his claim, Defendant produced a receipt for a $600,000 bank check dated July 14, 2016 and made payable to AEI, Mr. Sterling's company. *Id*.  In addition, Defendant produced bank records indicating that, as of July 14, 2016 (just before Defendant alleged he issued a $600,000 check to AEI), DMI had $715,662.41 in its bank account. SUF, ¶ 27; Painter Declaration, ¶ 8, Exhibit ZZ.

Plaintiffs hired a forensic analyst named Bruce Pixley to investigate the State Court Emails and Defendant's banking records. Painter Declaration, ¶ 5, Exhibit WW. After completing his investigation, Mr. Pixley filed a declaration with the state court in support of a motion for terminating sanctions filed by Plaintiffs against Defendant (the "Pixley Declaration"). *Id*.  In the Pixley Declaration, Mr. Pixley noted several issues with the State Court Emails that led to Mr. Pixley doubting the authenticity of the State Court Emails. *Id*.  Specifically, Mr. Pixley found the following discrepancies:

A. One of the emails did not contain a space between the month and date of the time stamp despite the other auto-generated time stamps from Defendant's email server having a space between the month and date entries;

B. The email also included a space between the "date" line and the "to" line, which the other auto-generated emails did not include;

C. An email allegedly sent by Mr. Dachev included a "date" field using the U.S. style of date designation instead of the Bulgarian style present in other emails from Mr. Dachev;

D. The purported email from Mr. Dachev contains underlined text, which is not consistent with the other emails drafted from Mr. Dachev.

*Id*.  In addition, Mr. Pixley stated in his declaration that the State Court Emails did not come up in a search of Defendant's email account. *Id*.

Mr. Pixley and Plaintiffs also investigated Defendant's banking records. SUF, ¶¶ 26-27.  After receiving the records, Plaintiffs found a copy of a check bearing the same serial number, date and payee as the $600,000 check purportedly sent to Mr. Sterling. SUF, ¶ 26; Painter Declaration, ¶ 7, Exhibit YY.  In contrast to the check

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

2:30 PM

**CONT...    Robin DiMaggio**                                                    **Chapter 7**

Defendant produced, the actual check reflected a $10,000 payment, not a $600,000 payment. *Id.* Plaintiffs also obtained DMI's account statement for July 2016. SUF, ¶ 27; Painter Declaration, ¶ 9, Exhibit AAA. Despite Defendant's produced copy of the statement showing $715,662.41 in DMI's account as of July 14, 2016, the account statement produced by the bank reflected an account balance of only $662.41. *Id.* Additionally, the July 2016 statement did not show a $600,000 withdrawal on July 14, 2016. *Id.*

### I.  Defendant's Bankruptcy Case and this Adversary Proceeding

On September 12, 2017, Defendant filed a voluntary chapter 7 petition. On September 25, 2017, Defendant filed his schedules and statements [Bankruptcy Docket, doc. 9]. On November 29, 2017, Plaintiffs filed a complaint against Defendant, requesting denial of Defendant's discharge and nondischargeability of the debt owed to Plaintiffs. In connection with this adversary proceeding, on May 1, 2018, Plaintiffs deposed Defendant about, among other things, Defendant's representations in his petition, schedules and statements. Painter Declaration, ¶ 2, Exhibit TT.

For instance, in his schedule A/B, Defendant scheduled an interest in DMI, but did not list Dimagic. In response to item 27 of his Statement of Financial Affairs ("SOFA"), which called for Defendant to list any businesses he owned, Defendant listed DMI, but did not make any reference to Dimagic. During his deposition, Defendant testified that Dimagic did not have any assets. Painter Declaration, ¶ 2, Exhibit TT, 282:2-5. Defendant also testified that Dimagic was a new entity. *Id.* As of the petition date, Dimagic had $68.66 in its account. Painter Declaration, ¶ 2, Exhibit GGG, p. 313. However, prior to the petition date, Defendant would deposit substantial amounts of money into Dimagic's account and use the account to pay for personal expenses. Painter Declaration, ¶ 2, Exhibit GGG, 280-325. Moreover, shortly after the petition date, Defendant deposited $21,230.83 into Dimagic's account. *Id.*

In his schedule A/B, Defendant also scheduled $700 in furniture. In his schedule C, Defendant claimed an exemption in the furniture for the full $700. At his deposition, Defendant indicated that, after the petition date, Defendant gave his furniture to a man named Richard Lambert in order to satisfy a debt owed to Mr. Lambert. Painter Declaration, ¶ 2, Exhibit TT, 274-75. Defendant did not list Mr. Lambert as a creditor

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

---

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

---

**2:30 PM**
**CONT...        Robin DiMaggio**                                                    **Chapter 7**

in his schedule E/F.

In his schedule I, Defendant indicated that he is unemployed and listed "$0.00" in monthly income.  In his schedule J, Defendant listed a total of $8,131 per month in expenses.  In his SOFA, Defendant indicated that he earned a total of $32,948 in 2015 and 2016, but a total of "$0.00" in 2017 from January until the petition date.  During his deposition, Defendant acknowledged that, in 2016, he earned approximately $7,000 in France that he did not report in his SOFA. Painter Declaration, ¶ 2, Exhibit TT, 302:16-305:9.  Defendant testified that he believed he did not have to report income earned overseas. *Id*.  Defendant also testified that he was paid cash for work he did for the United Nations. Painter Declaration, ¶ 2, Exhibit TT, 424:24-429:5.

Nevertheless, Defendant's banking and other records indicated that, on January 5, 2015, Defendant received $56,626.86 in royalties from the American Society of Composers, Authors, and Publishers ("ASCAP") into DMI's account. Painter Declaration, ¶¶ 14-15, Exhibit GGG, p.231, Exhibit HHH.  In addition, Defendant's banking records reflect several deposits between 2015 and 2017. Painter Declaration, ¶ 14, Exhibits FFF, GGG.

In his SOFA, Defendant also indicated that, within two years before the petition date, Defendant had not given any gifts to third parties with a value of more than $600.  However, during his deposition, Defendant testified that he paid Ms. Rich's association fees and other expenses on the Mulholland Property "because she was going through a hardship." Painter Declaration, ¶ 2, Exhibit TT, 319:20-22.  Defendant also testified that he gave a friend $1,400 as a gift. Painter Declaration, ¶ 2, Exhibit TT, 351:20-352:14.

In his petition, Defendant indicated his address is 5737 Kanan Road, #117, Agoura Hills, California 91301.  In his schedule A/B, Defendant indicated that he does not own any real property.  Despite Ms. Rich being listed as the buyer on the escrow papers and Defendant's testimony that he was paying homeowners' association fees on behalf of Ms. Rich, Plaintiffs suggest that Defendant may have purchased the Mulholland Property for himself in the name of Ms. Rich and that Defendant is currently living at the Mulholland Property.  Plaintiffs base this conclusion in part on the fact that Defendant paid many of the expenses related to the Mulholland Property, including association fees, utilities and taxes. Painter Declaration, ¶¶ 26-28, Exhibits

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                              **Hearing Room    301**

2:30 PM
**CONT...        Robin DiMaggio**                                              **Chapter 7**

QQQ-SSS.   On some of the checks used to make payments on the Mulholland
Property, Defendant included memo lines indicating that the payments were made on
behalf of himself. Painter Declaration, ¶ 26, Exhibit QQQ.  In addition, a process
server attempting to serve Ms. Rich found only Defendant at the Mulholland Property.
Declaration of Luis Morato [doc. 46].

Moreover, in response to item 3 of the SOFA, Defendant indicated he had not lived
with a spouse in a community property state within eight years of the petition date.
Nevertheless, at his deposition, Defendant testified that he had obtained a divorce
from Ms. Rich in 2012. Painter Declaration, ¶ 2, Exhibit TT, 293:14-18.  During his
deposition, Defendant also testified that he sold recording equipment on Craigslist for
an aggregate price of between $20,000 and $22,000. SUF, ¶ 45; Painter Declaration, ¶
2, Exhibit TT, 299:4-14.  Defendant did not disclose these transfers.  Defendant also
testified that he kept gear in a storage unit until February or March 2017. Painter
Declaration, ¶ 2, Exhibit TT, 305:15-307:9.  Defendant did not list the storage unit in
his SOFA.  At his deposition, Defendant also testified that an individual named Mark
Romans owed Defendant $2,000 as of the petition date. Painter Declaration, ¶ 2,
Exhibit TT, 325:21-326:3.  Defendant did not include this debt in his schedules.

At his deposition, Defendant testified that Mr. Sterling received between $500,000
and $1 million of Plaintiffs' money. Painter Declaration, ¶ 2, Exhibit TT,
111:6-112:10.  Defendant also testified that Mr. Sterling was the one who represented
that artists such as Mick Jagger had agreed to perform. Painter Declaration, ¶ 2,
Exhibit TT, 127:11-130:2.  Despite this testimony, Defendant's bank records showed
a total of $55,000 paid to Mr. Sterling. Painter Declaration, ¶ 12, Exhibit DDD.

Defendant also testified that he never had any discussions with anyone with respect to
securing performances from Justin Bieber, Diana Ross, Stevie Wonder, Christina
Aguilera, Coldplay, Radiohead, Beyoncé, The Eagles or Don Felder. Painter
Declaration, ¶ 2, Exhibit TT, 179:25-180:19.  Defendant further testified that he was
not aware of any artist accepting any deposit related to the Charity Concert. Painter
Declaration, ¶ 2, Exhibit TT, 206:23-207:3.  Finally, Defendant testified that he never
had any discussions with attorneys related about the Charity Concert. Painter
Declaration, ¶ 2, Exhibit TT, 91:11-16.  Defendant testified that Mr. Sterling
communicated with attorneys. *Id*.

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

---

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

---

2:30 PM

**CONT...      Robin DiMaggio**                                                        **Chapter 7**

On July 23, 2018, Plaintiffs filed a motion for summary judgment (the "MSJ") [doc. 40]. Through the MSJ, Plaintiffs request nondischargeability of the debt owed to them under 11 U.S.C. § 523(a)(2)(A), (a)(4) (on the bases of embezzlement and defalcation) and (a)(6). Plaintiffs also request denial of Defendant's discharge pursuant to 11 U.S.C. § 727(a)(2), (a)(3), (a)(4) and (a)(5). Plaintiffs also request prejudgment interest and punitive damages against Defendant. On July 31, 2018, Defendant filed a response to the MSJ (the "Response") [doc. 52]. In the Response, which is not supported by a declaration under penalty of perjury, Defendant asserts that he paid Mr. Sterling or AEI $55,000 and that Mr. Sterling was the one who "stole" the funds from Plaintiffs. Defendant further states that Plaintiffs also hired other companies to prepare for the Charity Concert, and that the involvement of the other entities is the reason the Charity Concert never happened.

## II. ANALYSIS

### A.    General Motion for Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure ("Rule") 56, applicable to this adversary proceeding under Federal Rule of Bankruptcy Procedure ("FRBP") 7056, the Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); Rule 56; FRBP 7056. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." 477 U.S. at 247–48 (emphasis in original).

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . . [S]ummary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. . . .

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

Wednesday, October 17, 2018                                    **Hearing Room     301**

2:30 PM
CONT...      **Robin DiMaggio**                                              **Chapter 7**

*Id.* at 248–50 (internal citations omitted).  Additionally, issues of law are appropriate
to be decided in a motion for summary judgment.  *See Camacho v. Du Sung Corp.*,
121 F.3d 1315, 1317 (9th Cir. 1997).

The initial burden is on the moving party to show that no genuine issues of material
fact exist based on "the pleadings, depositions, answers to interrogatories, and
admissions on file, together with affidavits, if any." *Celotex Corp. v. Catrett*, 477 U.S.
317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed. 265 (1986).  Once the moving party meets
its initial burden, the nonmoving party bearing "the burden of proof at trial on a
dispositive issue" must identify facts beyond what is contained in the pleadings that
show genuine issues of fact remain. *Id.*, at 324; *see also Anderson*, 477 U.S. at 256
("Rule 56(e) itself provides that a party opposing a properly supported motion for
summary judgment may not rest upon mere allegation or denials of his pleading, but
must set forth specific facts showing that there is a genuine issue for trial.").

The nonmoving party meets this burden through the presentation of "evidentiary
materials" listed in Rule 56, such as depositions, documents, electronically stored
information, affidavits or declarations, stipulations, admissions, and interrogatory
answers. *Id.*  To establish a genuine issue, the non-moving party "must do more than
simply show that there is some metaphysical doubt as to the material facts."
*Matsushita Electrical Industry Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106
S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see also Anderson*, 477 U.S. at 252 ("The
mere existence of a scintilla of evidence in support of the [non-moving party's]
position will be insufficient.").  Rather, the nonmoving party must provide "evidence
of such a caliber that 'a fair-minded jury could return a verdict for the [nonmoving
party] on the evidence presented.'" *U.S. v. Wilson*, 881 F.2d 596, 601 (9th Cir. 1989)
(quoting *Anderson*, 477 U.S. at 266).

   **B.  *Burden of Proof***

The plaintiff's burden of proof in a nondischargeability action under 11 U.S.C. §
523(a) is "the ordinary preponderance-of-the-evidence standard." *Grogan v. Garner*,
498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).  "Proof by the
preponderance of the evidence means that it is sufficient to persuade the finder of fact
that the proposition is more likely true than not." *In re Arnold & Baker Farms*, 177

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

---

**Wednesday, October 17, 2018**                                          **Hearing Room    301**

---

B.R. 648, 654 (B.A.P. 9th Cir. 1994), *aff'd sub nom. In re Arnold & Baker Farms*, 85
F.3d 1415 (9th Cir. 1996) (citing *In re Winship*, 397 U.S. 358, 371, 90 S.Ct. 1068,
1076, 25 L.Ed.2d 368 (1970)).

### C.  *11 U.S.C. § 523(a)(2)(A)*

Pursuant to 11 U.S.C. § 523(a)(2)(A), a bankruptcy discharge does not discharge an
individual debtor from any debt "for money, property, services, or an extension,
renewal, or refinancing of credit, to the extent obtained by – false pretenses, a false
representation, or actual fraud, other than a statement respecting a debtor's or an
insider's financial condition."

To prevail on a § 523(a)(2)(A) claim, the plaintiff must demonstrate, by a
preponderance of the evidence, the following five elements:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the
> debtor;
> (2) knowledge of the falsity or deceptiveness of his statement or
> conduct;
> (3) an intent to deceive;
> (4) justifiable reliance by the creditor on the debtor's statement or
> conduct; and
> (5) damage to the creditor proximately caused by its reliance on the
> debtor's statement or conduct

*In re Weinberg*, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009) (citing *In re Slyman*, 234 F.3d
1081, 1085 (9th Cir. 2000)).

### 1.  *Defendant's Misrepresentations*

Here, Plaintiffs have proven by a preponderance of the evidence that Defendant made
misrepresentations to Plaintiffs.  Prior to the initial deposit of $40,844, Defendant,
through emails, informed Plaintiffs that he needed the funds to secure performances
by several celebrity performers, including Mick Jagger, Bruno Mars and Justin
Timberlake.  Defendant represented to Plaintiffs that the parties were in danger of
losing the artists and damaging their reputations if Plaintiffs did not immediately wire

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

---

**Wednesday, October 17, 2018**                                   **Hearing Room      301**

---

**2:30 PM**
**CONT...       Robin DiMaggio**                                                      **Chapter 7**

the funds to Defendant.  In addition, Defendant represented to Plaintiffs that he needed $150,000 to secure performances by Mick Jagger and Earth, Wind & Fire.  Once again, rather than use the funds to secure these performances, Defendant used the funds on personal expenditures.  As to the $750,000, Defendant again informed Plaintiffs that he needed the funds to secure performances from several well-known artists and threatened that several artists would withdraw if Plaintiffs did not pay.  Again, Defendant used these funds to fund his lifestyle instead of secure performances by artists.

As to the $53,300, Defendant initially represented that he needed the funds to pay for public relations and legal fees after the Charity Concert received unfavorable local press.  Later, Defendant represented that he needed the funds to secure Mick Jagger and Earth, Wind & Fire.  Defendant did not use the funds for either of these purposes; instead, Defendant used the money on personal expenses.  As such, all of the above constitute misrepresentations, and Plaintiffs have met their burden of proving the first element of § 523(a)(2)(A).

### 2. *Knowledge of Falsity and Intent to Deceive*

A promise made without a present intent to perform satisfies § 523(a)(2)(A). *In re Rubin*, 875 F.2d 755, 759 (9th Cir. 1989); *In re Barrack,* 217 B.R. 598, 606 (B.A.P. 9th Cir. 1998).  "In addition, where the promisor knew or should have known of his prospective inability to perform, the promise can be found to be fraudulent." *In re Tran*, 301 B.R. 576, 582 (Bankr. N.D. Cal. 2003) (citing *Barrack,* 217 B.R. at 606).  "[A] statement made with reckless indifference to the truth is sufficient to satisfy the requirement of a fraudulent representation by the plaintiff." *Id*.  (citing *In re Anastas*, 94 F.3d 1280, 1286 (9th Cir. 1996); *and In re Ettell,* 188 F.3d 1141, 1145 n.4 (B.A.P. 9th Cir. 1999).

Because intent is difficult to prove through direct evidence, it "may be established by circumstantial evidence, or by inferences drawn from a course of conduct.  Therefore, in determining whether the debtor had no intention to perform, a court may look to all the surrounding facts and circumstances." *In re Barrack*, 217 B.R. 598, 607 (B.A.P. 9th Cir. 1998); *see also In re Eashai*, 87 F.3d 1082, 1087 (9th Cir. 1996) ("[A] court may infer the existence of the debtor's intent… if the facts and circumstances of a particular case present a picture of deceptive conduct by the debtor.").  "The scienter

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

---

**Wednesday, October 17, 2018**                                   **Hearing Room    301**

---

2:30 PM
**CONT...        Robin DiMaggio**                                                    **Chapter 7**

requirement for a fraudulent misrepresentation is established by showing either actual knowledge of the falsity of a statement, or reckless disregard for its truth." *In re Gertsch*, 237 B.R. 160, 167 (9th Cir. 1999) (internal quotation omitted).

Plaintiffs met their burden of proving that Defendant made the misrepresentations above with knowledge of the falsity of the statements and with an intent to deceive Plaintiffs. At the very least, Defendant acted with reckless indifference to the truth of his statements. There is substantial circumstantial evidence demonstrating that Defendant represented to Plaintiffs that he would secure several artists for the Charity Concert while knowing he would not use the funds for that purpose and intending to deceive Plaintiffs to fund Defendant's lifestyle.

First, as to the initial deposit of $40,844, Defendant represented to Plaintiffs that he had received a "verbal yes" from both Mick Jagger and Earth, Wind & Fire to perform at the Charity Concert. In response to Defendant's representations that he had secured both artists, Plaintiffs wired two payments of $9,960 to Defendant. Within a week of the first deposit and on the same day as the second deposit, Defendant withdrew the funds from DMI's account and began depositing the funds into his personal account for personal use. Defendant then began pressuring Plaintiffs to wire the rest of the $40,844 to Defendant by informing them that failing to pay would be "extremely dangerous" and that their reputations would be damaged. Instead of using the funds to secure artists, Defendant again withdrew the funds or used DMI's or his personal debit cards to make personal purchases using the cards.

As to the $150,000 deposit, Defendant sent Plaintiffs an Artist Acquisition Invoice promising to return the funds or apply the funds to a different artist if Mick Jagger or Earth, Wind & Fire did not perform. Immediately upon receiving the funds from Plaintiffs, Defendant transferred the $150,000 into his personal account and, *on the very same day*, withdrew $62,853.18 in cash. The next day, Defendant used $13,136.23 to pay his personal credit card, and, within the next six days, Defendant withdrew another $38,101.84. Defendant then used the remaining funds on personal expenses. Again, in light of the declarations filed by these artists' talent agents, Defendant never used the funds to secure Mick Jagger or Earth, Wind & Fire. Instead, Defendant rapidly depleted the funds by paying his personal expenses or converting the funds into cash.

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

---

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

---

**2:30 PM**
**CONT...        Robin DiMaggio**                                              **Chapter 7**

Regarding the $53,300, Defendant first informed Plaintiffs that he needed the funds to cover defamation and legal fees.  Defendant represented in one of his emails that he was worried about defamation because some of the artists "have not legally been acquired… to perform." Botev Declaration, ¶ 14, Exhibit J, Panev Declaration, ¶ 2, Exhibit CC.  After Plaintiffs emailed Defendant about the invoice, Defendant then changed his story and stated he needed the funds to secure Mick Jagger and Earth, Wind & Fire as performers.  Defendant threatened to quit if Plaintiffs did not furnish the funds.  Immediately after Plaintiffs wired the funds to Defendant, Defendant withdrew the funds and deposited the funds into his personal account.  Defendant then withdrew the funds in cash and continued to spend the funds on himself.

To receive the final $750,000 from Plaintiffs, Defendant again created a false sense of urgency.  Defendant promised to secure several well-known artists, including Jennifer Lopez, Roger Waters and John Legend, but informed Plaintiffs that the deal would expire unless Plaintiffs wired $750,000 by the next day.  Defendant initially sent Plaintiffs an invoice by an entity called One Talent Agency.  However, when Plaintiffs asked Defendant questions about One Talent Agency, such as the entity's registration number or account information, Defendant sent Plaintiffs and invoice from DMI instead.

To apply additional pressure on Plaintiffs, Defendant continued to represent to Plaintiffs that they would "lose every artist" if Plaintiffs did not wire the funds.  Defendant also promised that, if an artist did not commit, Plaintiffs would receive a refund.  After Plaintiffs insisted on certain changes to the agreement, Defendant forwarded to Plaintiffs an email purporting to be from a man named Neil Epstein, in which the author informed Plaintiffs that their requests were unusual and that the artists would "pass on this event" if they did not receive the money.  After numerous emails from Defendant, in which Defendant repeatedly told Plaintiffs they were about to lose all of the artists, and after Defendant agreed to place the funds in an escrow account and refund the money if artists did not commit, Plaintiffs wired the $750,000 to Defendant.  At his deposition, Defendant testified that he never communicated with many of the artists named in Defendant's emails to Plaintiffs.

Despite Defendant's statements about the urgency of the deal, Defendant kept the $750,000 in DMI's account for four days.  On August 9, 2016, Defendant transferred the entire $750,000 into his personal account.  Throughout the month of August,

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

---

2:30 PM

**CONT...        Robin DiMaggio**                                                    **Chapter 7**

Defendant withdrew a total of $305,790.19 in cash, used $251,370 to purchase the Mulholland Property and depleted significant sums by spending thousands of dollars on expensive personal purchases, such as clothing, dining and electronics.  Eventually, Defendant depleted all of Plaintiffs' funds by withdrawing the funds as cash or spending the funds on Defendant's lifestyle.  To date, Defendant has not repaid Plaintiffs any of the funds.

Although Defendant's actions at the time he made the representations establish that Defendant knew the representations were false and that Defendant intended to deceive Plaintiffs, Defendant's subsequent actions also bolster the Court's finding that Defendant possessed fraudulent intent at the time he induced Plaintiffs to transfer the funds.  For example, after Plaintiffs requested a refund, Defendant falsely informed Plaintiffs that Mr. Dachev had allowed Defendant to keep the funds for a concert in June 2017.  Later, in state court, Defendant produced an email, purportedly from Mr. Dachev, stating that Defendant could keep the funds.  Plaintiffs' expert in state court believed the email was a forgery.

Defendant also attempted to blame Mr. Sterling for taking Plaintiffs' funds.  To support his argument, Plaintiff produced a check in the amount of $600,000 allegedly issued to Mr. Sterling.  However, Defendant's bank records demonstrated that the check was actually in the amount of $10,000.  In state court, Defendant also produced a bank statement reflecting a balance of $715,662.41 in DMI's account as of July 14, 2016.  The actual bank statement from that time period reflected a balance of $662.41.

Moreover, Defendant repeatedly changed the artists he promised he would secure for the Charity Concert.  Initially, Defendant promised Mick Jagger, Earth, Wind & Fire, Rod Stewart, "J. Depp," Slash, Bruno Mars and Justin Timberlake.  Later, Defendant informed Plaintiffs he would be able to secure Jennifer Lopez, Robbie Williams, Roger Waters, Don Felder, Christina Aguilera and John Legend.  Defendant also mentioned Blondie and the Beach Boys.  Finally, after asking Plaintiffs to move the Charity Concert to December 2016, Defendant told Plaintiffs he had communicated with managers for Lenny Kravitz, Alicia Keys and Calvin Harris.  Nevertheless, at his deposition, Defendant acknowledged that he had never communicated with any of these artists or their representatives and that, as far as he knew, none of the artists retained any deposits of funds.  In light of the substantial circumstantial evidence above, the Court finds Defendant knew that his representations to Plaintiffs were false

---

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                              **Hearing Room      301**

---

**2:30 PM**
**CONT...       Robin DiMaggio**                                              **Chapter 7**

and that Defendant intended to deceive Plaintiffs.

### 3.  *Justifiable Reliance*

Plaintiffs also have met their burden of proving that Plaintiffs justifiably relied on
Defendant's statements.  Plaintiffs are based in Bulgaria and relied on Defendant's
knowledge of the American music industry.  Moreover, on several occasions,
Defendant forwarded to Plaintiffs emails from purported third parties stressing that
Plaintiffs' funds were necessary to proceed with securing performances for the Charity
Concert.  Defendant held himself out as someone with numerous and meaningful
connections in the music industry.  As a result, Plaintiffs' reliance was justifiable.

### 4.  *Damages Proximately Caused by Reliance*

Plaintiffs also proved, by a preponderance of the evidence, that their damages (the
extent of which is discussed below) were proximately caused by their reliance on
Defendant's statements and conduct.  Defendant's transferred funds and incurred costs
in reliance on Defendant's assurance that he would secure performances for the
Charity Concert.  Defendant did not secure any such performances, and, as a result,
Plaintiffs were injured in the amounts discussed below.

### D.  *11 U.S.C. § 523(a)(4)*

Pursuant to 11 U.S.C. § 523(a)(4), a bankruptcy discharge does not discharge an
individual debtor from any debt "for fraud or defalcation while acting in a fiduciary
capacity, embezzlement, or larceny."

### 1.  *Embezzlement*

"Federal law and not state law controls the definition of embezzlement for purposes of
section 523(a)(4)." *In re Wada*, 210 B.R. 572, 576 (B.A.P. 9th Cir. 1997).
"Embezzlement is defined as 'the fraudulent appropriation of property by a person to
whom such property has been [e]ntrusted or into whose hands it has lawfully come.'"
*Id.* (quoting *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed.
422 (1895)).

"Embezzlement" within the meaning of § 523(a)(4) requires three elements: (1)

---

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

---

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

---

2:30 PM
**CONT...        Robin DiMaggio**                                                              **Chapter 7**

property rightfully in the possession of a nonowner, (2) the nonowner's misappropriation of the property to a use other than that for which it was entrusted, and (3) circumstances indicating fraud. *In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991). For purposes of embezzlement, a fiduciary relationship is not required. *Id*., at 555. Here, Plaintiffs have met their burden of proving, by a preponderance of the evidence, that Defendant embezzled Plaintiffs' funds.

> **a.    *Property Rightfully in Possession of Nonowner***

First, the funds were rightfully in the possession of Defendant, a nonowner of the funds. In *In re Wada*, 210 B.R. 572 (B.A.P. 9th Cir. 1997), the creditor hired the debtor, doing business as Uniglobe Carriage Travel, to arrange travel for the creditor. *Wada*, 210 B.R. at 574. To secure travel accommodations, the creditor advanced a total of $119,400 to the debtor with the expectation that, if the creditor canceled travel plans, the creditor would receive a refund. *Id*. After the creditor canceled an upcoming trip, the debtor admitted she had kept part of the advanced funds for her personal use. *Id*.

Subsequently, the debtor filed a chapter 7 petition and the creditor moved for dischargeability of the debt owed to it under the embezzlement prong of 11 U.S.C. § 523(a)(4). *Id*., at 575. In its analysis on appeal, the Bankruptcy Appellate Panel of the Ninth Circuit (the "BAP") found that the first element of embezzlement was present in *Wada*. *Id*., at 576-77. Specifically, the BAP held that the debtor was a "nonowner" of the funds:

> Here, it is undisputed that the funds transferred to the Debtor within her role as travel agent did not contain compensation for her services. The Debtor had no contractual right to any part of the funds. Her only role was to act as a conduit of the funds; to apply them exclusively for the arrangement of travel accommodations. Money received by travel agents to be paid to travel providers is not income.
>
> …
>
> [T]he fact the Debtor had lawful possession of the funds and wide discretion to dispose of the funds on behalf of the Appellant is insufficient to confer ownership of the funds to the Debtor. The funds given to the Debtor were not authorized to be used for anything other

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

2:30 PM
**CONT...**       **Robin DiMaggio**                                              **Chapter 7**

than travel arrangements. The funds were not a gift, nor did they
contain compensation for the Debtor's services. The Debtor took the
funds and put them to a use not intended by the Appellant.

*Id.* (internal citation omitted).

As in *Wada*, Defendant was a "nonowner" of the funds.  Defendant did not have a
contractual right to the funds, and Plaintiffs did not furnish the funds to Defendant as
compensation for his services.  Instead, as established through the string of emails
between the parties, Defendant's role was to "act as a conduit of the funds," as in
*Wada*, by using the funds to secure performances for the Charity Concert or, in the
case of the $53,300 transferred to Defendant, to pay for public relations and legal
costs associated with promotion of the Charity Concert. *Wada*, 210 B.R. at 576-77.
Plaintiffs did not authorize Defendant's use of the funds for any other use.  As such,
upon the transfer of the funds to Defendant, Defendant was rightfully in possession of
the funds but continued to be a "nonowner" acting as a conduit between Plaintiffs and
third parties, such as artists, lawyers and publicists, who were intended to be the final
recipients of the funds.  Consequently, the first element of embezzlement is satisfied.

### b.     *Nonowner's Misappropriation of Property to Use Other Than That for Which it was Entrusted*

Plaintiffs also demonstrated that Defendant misappropriated the funds to a use other
than that for which it was entrusted.  Once again, the communications between the
parties establish that Plaintiffs provided the funds to Defendant for two reasons: (A)
as to the $53,300, for Defendant to pay legal and public relations fees to address
unfavorable local press about the Charity Concert; and (B) as to the rest of the funds,
to secure artists to perform at the Charity Concert.  Defendant's banking records
establish that Defendant did not use the funds for either of these purposes.  Instead,
upon transfer of the funds from DMI's account to his personal account, Defendant
either depleted the funds through multiple cash withdrawals or spent the funds on a
variety of personal expenses.

Despite responding to the MSJ, Defendant has not proffered any evidence that he
spent any of the $53,300 on public relations or legal fees or that he spent any of the
remaining funds on securing artists for the Charity Concert.  In fact, the evidence

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

___

**Wednesday, October 17, 2018**                                        **Hearing Room    301**

___

**2:30 PM**
**CONT...        Robin DiMaggio**                                                    **Chapter 7**

shows the opposite.  After receiving the first infusion of funds from Plaintiffs, in the
amount of $40,844, Defendant immediately withdrew $32,226.86.  Defendant spent
the portion he did not withdraw on purchases at gas stations, grocery stores, coffee
shops, pet stores, restaurants and other retail establishments.  As to the $32,226.86,
Defendant deposited part of these funds into his personal account, from which
Defendant withdrew additional funds in cash and spent the remainder of the funds on
personal expenses, including telephone payments and clothing.

Plaintiffs then provided Defendant approximately $150,000 for the sole purpose of
securing Mick Jagger and Earth, Wind & Fire.  Agents for both artists provided
testimony that neither Defendant nor Mr. Sterling ever negotiated for either artist's
performance at the Charity Concert in Sofia, Bulgaria.  Once again, upon receiving the
funds from Plaintiffs, Defendant immediately withdrew $155,600 from DMI's
account and deposited the funds into his personal account.  Defendant then made
multiple cash withdrawals, paid off his personal credit card and spent the remaining
funds on personal expenses.

As to the $53,300 deposited by Plaintiffs, Defendant informed Plaintiffs he would use
the funds for "legal defamation PR," "legal attorney fees" and "administrative
services." Botev Declaration, ¶ 14, Exhibit J.  Instead, Defendant moved the funds
from DMI's account to his personal account and then, within two and a half weeks of
receiving the $53,300, withdrew a total of $61,831.69 as cash.  Defendant continued
to use any remaining funds in his account on personal expenses.

The final $750,000 Plaintiffs sent to Defendant was to be used to secure performances
by multiple artists.  However, Defendant acknowledged at this deposition that he
never actually communicated to many of these named artists or their representatives.
Defendant also immediately transferred the $750,000 to his personal account and
withdrew a total of $305,790.19 in cash throughout the month of August 2016.  From
these funds, Defendant deposited $150,000 into Dimagic's account, which he then
used for personal expenses.  Defendant also used $251,370 of the $750,000 to
purchase the Mulholland Property allegedly for Ms. Rich.  From August 2016 until
October 2016, Defendant expended substantial sums on personal purchases, both
lavish and ordinary.  By September 2016, Defendant had closed out DMI's account
with an $87 balance.  By June 2017, Defendant whittled down the funds in his
personal account to $147.16 and, as of the petition date, Defendant had used all but

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

---

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

---

<u>2:30 PM</u>
**CONT...        Robin DiMaggio**                                                **Chapter 7**
$68.66 from Dimagic's account.

The only argument offered by Defendant in response to misappropriation is that
Defendant issued checks totaling $55,000 to Mr. Sterling or AEI.  However, to the
extent the payments to Mr. Sterling or AEI were made using Plaintiffs' funds (it is
unclear from which account Defendant issued the checks), Plaintiffs did not authorize
any transfers to either Mr. Sterling or AEI.  Moreover, there is no indication
whatsoever that Defendant transferred the funds to Mr. Sterling or AEI for the
purpose of securing performances for the Charity Concert or paying public relations or
attorneys' fees in response to the press conference promoting the Charity Concert.
Because Defendant *only* had authority to use the funds within the parameters drawn
by Plaintiffs, and Plaintiffs never authorized a transfer of funds to Mr. Sterling or AEI,
any transfer of Plaintiffs' funds to Mr. Sterling or AEI was a misappropriation of the
funds.  Further, Defendant's additional arguments that other companies were
responsible for preparing for the Charity Concert is irrelevant to whether Defendant
misappropriated the funds entrusted to him.  In light of the above, the second element
of embezzlement is also satisfied.

    *c.*    *Circumstances Indicating Fraud*

For the reasons stated above, Defendant acted with fraudulent intent.  However, even
if the Court found that Plaintiffs had not satisfied the elements of § 523(a)(2)(A),
Plaintiffs have demonstrated that there were "circumstances indicating fraud" for
purposes of embezzlement.

Courts within the Ninth Circuit appear to disagree on whether fraudulent intent is
required as to this element and, if so, what kind of fraudulent intent satisfies this
element. *See In re Wolf*, 577 B.R. 327, 344-45 (Bankr. C.D. Cal. 2017) ("[I]t appears
to be unsettled whether fraudulent intent is required for this section. The Ninth Circuit
has made 'no determination concerning whether federal law requires a finding of
fraudulent intent for larceny....'") (quoting *In re Ormsby*, 591 F.3d 1199, 1205–06
(9th Cir. 2010)); *see also In re Leverton*, 2014 WL 3724162, at *3 (Bankr. D. Ariz.
Jul. 25, 2014) ("Courts in the Ninth Circuit disagree whether misrepresentation is
required to establish 'circumstances indicating fraud' under § 523(a)(4).").

In a relatively recent unpublished decision, the BAP, relying on the Supreme Court of

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

---

**Wednesday, October 17, 2018**                                           **Hearing Room    301**

---

**2:30 PM**
**CONT...        Robin DiMaggio**                                                    **Chapter 7**

the United States' decision in *Husky Int'l Elecs., Inc. v. Ritz*, 136 S.Ct. 1581, 194
L.Ed.2d 655 (2016), found that "circumstances indicating fraud" for purposes of
embezzlement is "not synonymous" with an "intent to defraud" as required by §
523(a)(2)(A):

> Debtor primarily asserts error because the state court did not make an
> explicit finding of fraud. We acknowledge this point but find it
> inapposite. The finding required for a determination of § 523(a)(4)
> embezzlement is that Debtor's actions indicated fraud. Such a
> determination is not synonymous with an intent to defraud as required
> under § 523(a)(2)(A). And even if it were, § 523(a)(2)(A) does not
> necessarily require a misrepresentation as Debtor argues. Recently
> in Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581 (2016), the United
> States Supreme Court clarified that misrepresentation is not an element
> of actual fraud under § 523(a)(2)(A). That is, actual fraud may include
> a wider array of misconduct. The record here sufficiently establishes
> misconduct that falls within the broader definition of actual fraud and
> even more plainly meets the § 523(a)(4) requirement of indicia of
> fraud.

*In re Phillips*, 2016 WL 7383964, at *5 (B.A.P. 9th Cir. Dec. 16, 2016).

Other courts appear to agree that, unlike § 523(a)(2)(A), the intent to defraud need not
be present at the time of the misrepresentation or for the purpose of inducing the
creditor to furnish funds.  For instance, several courts have held that a debtor's
subsequent concealment of misappropriated funds satisfies the "circumstances
indicating fraud" element of embezzlement. *See In re Hatch*, 465 B.R. 479, 487
(Bankr. W.D. Mich. 2012) ("Because embezzlement, by definition, involves a
situation in which the debtor initially has lawful possession of the property at issue, it
is not necessary for a creditor to prove that a debtor's misrepresentations induced it to
part with property.  Rather, the creditor needs only to prove misappropriation and
'circumstances indicating fraud,' such as circumstances suggesting that the debtor
intended to conceal the misappropriation.").

In *Wada*, the BAP noted that, after the debtor misappropriated the creditor's funds, the
debtor "informed [the creditor] that she was unable to refund approximately

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                        **Hearing Room    301**

**2:30 PM**
**CONT...**        **Robin DiMaggio**                                                    **Chapter 7**

$84,000.00 of the forwarded funds because she had incurred non-refundable deposits." *Wada*, 210 B.R. at 577.  However, "when faced with discovery of the false statement, the Debtor admitted the deposits had never been made." *Id*.  The BAP held that these facts were sufficient to qualify as "circumstances indicating fraud." *Id*.

In *Wolf*, the bankruptcy court held that the plaintiff had not proven its claim under § 523(a)(2)(A) because the representations at issue "were not shown to be false at the time they were made." *Wolf*, 577 B.R. at 343.  However, the court found that the plaintiff had proven its claim of embezzlement and shown "circumstances indicating fraud" based on the following:

> If intent is required, the evidence here easily supports Defendant's fraudulent intent.  As detailed earlier, the Defendant admitted not paying for all of the diamonds he received and tried to blame others or valuation issues.  The circumstances surrounding how Wolf managed the books and records of his business suggest that he did not want the business dealings to be easily traced.  In particular, the regular destruction of the cash books and the inability to account for individual missing stones despite each stone being accompanied by a memo suggests a willful disregard for sound bookkeeping that could only inure to Defendant's benefit.  Defendant's ever-changing narrative regarding the reasons for missing diamonds and his conduct in replacing the hard drive of a computer after learning that Paz was seeking access to the data it contained also show that he fraudulently and willfully took Plaintiff's diamonds for himself.  The third element of embezzlement is satisfied.

*Id*., at 345.  As such, in *Wolf*, although the bankruptcy court did not find that the debtor fraudulently induced the creditor to give the debtor diamonds for purposes of § 523(a)(2)(A), the debtor's subsequent behavior after the debtor misappropriated the diamonds satisfied the "circumstances indicating fraud" element. *See also In re Kaplan*, 2016 WL 1321138, at *13 (Bankr. C.D. Cal. Apr. 1, 2016) (relying on *Wada* and finding that the debtor's lies regarding what the debtor did with the creditor's funds satisfied the "circumstances indicating fraud" element of embezzlement).

Moreover, "courts have held that a debtor's intent to pay back the money she or he

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

---

**Wednesday, October 17, 2018**                                    **Hearing Room        301**

---

**2:30 PM**
**CONT...        Robin DiMaggio**                                                        **Chapter 7**

does not own, does not negate the intent to defraud" for purposes of embezzlement. *In re Halsam*, 2016 WL 4441228, at *3 (Bankr. D. Ariz. Aug. 22, 2016) (collecting cases); *see also In re Bevilacqua*, 53 B.R. 331, 334 (Bankr. S.D.N.Y. 1985) (holding that, although the debtor intended to use the funds only temporarily, the plaintiff was deprived of his property and demonstrated embezzlement for purposes of section 523(a)(4)); *and Matter of Shuler*, 21 B.R. 643, 644 (Bankr. D. Idaho 1982) ("The fact that the intent is to deprive the rightful owner of the funds only temporarily and not permanently ... does not eliminate the element of intent.").

Here, Plaintiffs also met their burden of proving that there existed circumstances indicating fraud surrounding Defendant's misappropriation of funds.  First, like in cases above, Defendant actively concealed his misappropriation of funds.  After Plaintiffs sued Defendant, Defendant claimed he had sent $600,000 of Plaintiffs' funds to Mr. Sterling for use to secure artists and produced a receipt for a bank check dated July 14, 2016.  However, after Plaintiffs subpoenaed Defendant's bank records, they discovered that the check was for a transfer of $10,000, not $600,000.  Based on Defendant's banking records, Defendant has given Mr. Sterling and/or AEI a total of $55,000.  As noted above, Defendant continues to blame Mr. Sterling for the disappearance of Plaintiffs' funds.

In addition, Defendant produced a bank statement in state court showing that DMI had $715,662.41 in its bank account as of July 14, 2016.  Defendant's actual bank records reflected a balance of only $662.41.  Further, Plaintiffs' expert from state court believed that Defendant forged emails purporting to show that Mr. Dachev consented to Defendant keeping Plaintiffs' funds to secure performances for a June 2017 concert.

Moreover, Defendant repeatedly pressured Plaintiffs to send Defendant money by creating a false sense of urgency.  Prior to many of the deposits from Plaintiffs, Defendant would name several well-known musical artists from whom Defendant had allegedly received verbal confirmations and concurrently state that the artists would be unavailable if Plaintiffs did not immediately provide the funds.  For instance, prior to the initial transfer of $40,844, Defendant forwarded an email allegedly written by a "J.F." informing Plaintiffs that he had "verbally confirmed" that "J. Depp, SIR Mick Jagger, Rod Stewart, Slash, Bruno Mars [and] Justin Timberlake" would be available but that, if Plaintiffs did not immediately transfer the requested money, "[a]ll this is

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

---

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

---

**2:30 PM**
**CONT...      Robin DiMaggio**                                                   **Chapter 7**

for nothing." Botev Declaration, ¶ 11, Exhibit G.  Defendant also told Plaintiffs that
failing to provide the funds to Defendant would be "extremely dangerous" to their
reputations. Botev Declaration, ¶ 9, Exhibit E.  Despite Defendant's noted urgency,
upon receiving the $40,844, Defendant immediately withdrew the funds as cash or
spent the funds on Defendant's own personal expenses.

Prior to receiving the $750,000 deposit which Defendant represented he would use to
secure performances from Jennifer Lopez, Robbie Williams, Don Felder, Roger
Waters and Pink!, Defendant sent Plaintiffs a Deal Offer Form set to expire one day
later. Panev Declaration, ¶ 5, Exhibit FF.  Once again, through several emails to
Plaintiffs, Defendant repeatedly threatened that all the artists would withdraw if
Plaintiffs did not immediately wire the $750,000 requested by Defendant.  Instead of
using the $750,000 to secure artists, Defendant either withdrew the funds as cash or
spent the funds on his own expenses.  Evidently, there was no actual emergency need
for funds for the purpose of securing artists.

Aside from Defendant's emails regarding the urgent need for funds, Defendant also
resisted providing information about One Talent Agency to Plaintiffs after Defendant
sent Plaintiffs a Deal Offer Form using One Talent Agency's letterhead.  Plaintiffs
requested information about One Talent Agency's registration number, address,
representatives, bank accounts and contacts.  Instead of providing this information to
Plaintiffs, Defendant informed Plaintiffs that, if Plaintiffs paid One Talent Agency
directly, they would incur significant taxes.  Defendant then sent Plaintiffs a different
agreement using DMI's letterhead and instructed Plaintiffs to wire the $750,000 into
DMI's account.  When Plaintiffs asked Defendant to place the funds in an escrow
account they could monitor, Defendant stalled, continued to pressure Plaintiffs under
the threat of losing artists and, despite reassuring Plaintiffs that he would create an
escrow account, never did.  Instead, Defendant withdrew all of the funds as cash or
spent the funds on his own personal expenses.

Moreover, although Defendant initially represented to Plaintiffs that he needed
$53,300 to cover public relations costs and legal fees, Defendant later told Mr. Panev
that he could not secure performances from Mick Jagger or Earth, Wind & Fire
without the transfer of $53,300.  When Mr. Panev informed Defendant that Plaintiffs
had already paid approximately $150,000 to secure these performances, Defendant
threatened to resign.

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

<u>2:30 PM</u>
CONT...        **Robin DiMaggio**                                              **Chapter 7**

Eventually, Defendant emailed Plaintiffs informing them that "an entire group of managers" wanted to postpone the Charity Concert to December 1, 2016. Panev Declaration, ¶ 15, Exhibit PP.  When Plaintiffs asked Defendant to return their funds, Defendant emailed Plaintiffs blaming Plaintiffs for the delay. Panev Declaration, ¶ 16, Exhibit QQ.  In that email, Defendant told Plaintiffs that managers representing Lenny Kravitz, Alicia Keys and Calvin Harris were concerned about the Charity Concert, despite the fact that Defendant had never previously represented that he was attempting to secure any of these acts for the Charity Concert.

Initially, Defendant told Plaintiffs he would wire back the funds once artists returned deposits to Defendant.  After additional requests from Plaintiffs, Defendant informed Mr. Panev that he had received confirmation from Mr. Dachev that Defendant could keep the funds to secure performances for the Charity Concert, which Defendant now represented would take place in June 2017.  During all of the above communications with Plaintiffs, Defendant was converting Plaintiffs' funds into cash or spending Plaintiffs' funds on personal expenses.  To date, Defendant has never returned any of the funds to Plaintiffs.

Finally, Defendant's spending dramatically increased after June 2016, when Plaintiffs made the initial deposit into DMI's account, and Defendant began spending large sums on personal goods and services.  Defendant's banking records demonstrate that Defendant lived large on the misappropriated funds; Defendant spent significant sums on fine dining, expensive clothing, travel, at psychic stores and on several other personal goods and services.  In light of these facts, there are several circumstances indicating fraud, and Plaintiffs have met their burden of demonstrating that Defendant embezzled funds within the meaning of § 523(a)(4).

### 2.  *Defalcation*

A debt is nondischargeable for fraud or defalcation while acting in a fiduciary capacity "where (1) an express trust existed, (2) the debt was caused by fraud or defalcation, and (3) the debtor acted as a fiduciary to the creditor at the time the debt was created." *In re Niles*, 106 F.3d 1456, 1459 (9th Cir. 1997).

Whether a relationship is a fiduciary one within the meaning of § 523(a)(4) is a

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

**Wednesday, October 17, 2018**                                          **Hearing Room    301**

2:30 PM
**CONT...       Robin DiMaggio**                                                        **Chapter 7**

question of federal law. *Ragsdale v. Haller*, 780 F.2d 794, 795 (9th Cir. 1986); *see also In re Cantrell*, 269 B.R. 413, 420 (B.A.P. 9th Cir. 2001) ("The definition of 'fiduciary capacity' under § 523(a)(4) is governed by federal law."). In the context of dischargeability, the fiduciary relationship must arise from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt. *Ragsdale*, 780 F.2d at 796.  Under § 523(a)(4), the "scope of the term 'fiduciary capacity' is a question of federal law," but "the Ninth Circuit has considered state law to ascertain whether the requisite trust relationship exists." *In re Honkanen*, 446 B.R. 373, 379 (B.A.P. 9th Cir. 2011); *Ragsdale*, 780 F.2d at 796.

"A trust under California law may be formed by express agreement, by statute, or by case law." *Cantrell*, 269 B.R. at 420. An express trust under California law requires the following five elements: (1) present intent to create a trust; (2) a trustee; (3) trust property; (4) a proper legal purpose; and (5) a beneficiary. *Honkanen*, at 379 fn. 6 (citing Cal. Prob. Code §§ 15201–15205). A technical trust under California law is one "arising from the relation of attorney, executor, or guardian, and not to debts due by a bankrupt in the character of an agent, factor, commission merchant, and the like." *Id.*, at n.7 (quoting *Royal Indemnity Co. v. Sherman*, 269 P.2d 123, 125 (Cal. Ct. App. 1954).  Additionally, "[t]rusts arising as remedial devices to breaches of implied or express contracts—such as resulting or constructive trusts—are excluded, while statutory trusts that bear the hallmarks of an express trust are not." *Id.* (citing *In re Pedrazzini*, 644 F.2d 756, 759 (9th Cir. 1981)).

Plaintiffs have not met their burden of demonstrating that an express, technical or statutory trust existed prior to the misappropriation of funds.  Plaintiffs argue that Defendant's promise to create an escrow account was sufficient to create an express trust despite the fact that Defendant never created an escrow account or placed the $750,000 therein.  Plaintiffs rely on *In re Nassbridges*, 434 B.R. 573 (Bankr. C.D. Cal. 2010).  In *Nassbridges*, the bankruptcy court found that the debtor, an investment broker, owed a fiduciary duty to the plaintiffs because of the "great repose of confidence between a client and a more sophisticated investment broker, and there was a trust *res*." *Nassbridges*, 343 B.R. at 587-88.  After an appeal of the bankruptcy court's decision in *Nassbridges*, the BAP found that "a technical trust relationship, at minimum, existed between [the debtor] and [the plaintiffs]…." *In re Nassbridges*, 2011 WL 3244396, at *14 (B.A.P. 9th Cir. Jul. 15, 2011).

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

---

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

---

2:30 PM
**CONT...        Robin DiMaggio**                                                    **Chapter 7**

Here, Plaintiffs have neither shown that Defendant held a "more sophisticated" position, such as that of an investment broker, or that an express, statutory or technical trust existed between the parties prior to Defendant's embezzlement of the funds.  As a result, Plaintiff has not met its burden of demonstrating defalcation for purposes of § 523(a)(4).

### E.  *11 U.S.C. § 523(a)(6)*

11 U.S.C. § 523(a)(6) states that a discharge under 11 U.S.C. § 727 does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

Demonstrating willfulness requires a showing that defendant intended to cause the injury, *not* merely the acts leading to the injury. *Kawaauhau v. Geiger,* 523 U.S. 57, 61–62, 118 S.Ct. 974, 977 (1998).  Debts "arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.*, 523 U.S. at 64.  It suffices, however, if the debtor knew that harm to the creditor was "substantially certain." *In re Su*, 290 F.3d 1140, 1145-46 (9th Cir. 2002); *In re Jercich*, 238 F.3d 1202, 1208 (9th Cir. 2001) ("[T]he willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury *or* that the debtor believed that injury was substantially certain to occur as a result of his conduct.") (emphasis in *Jercich*).

Under 11 U.S.C. § 523(a)(6), the injury must also be the result of maliciousness. *Su*, 290 F.3d at 1146.  Maliciousness requires (1) a wrongful act; (2) done intentionally; (3) which necessarily causes injury; (4) without just cause or excuse. *Id.*, at 1147.  Maliciousness does not require "personal hatred, spite, or will-will." *In re Bammer*, 131 F.3d 788, 791 (9th Cir. 1997).

Plaintiffs offer only the following analysis with respect to § 523(a)(6)—

> Here, the record is clear that DiMaggio acted willfully and maliciously. As shown at length, DiMaggio repeatedly lied about why he needed Plaintiffs' money, what he was going to do with it and what he actually did with it, all in an effort to extract more money from the Foundation.

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                    **Hearing Room    301**

2:30 PM

**CONT...**        **Robin DiMaggio**                                            **Chapter 7**

MSJ, p. 29.  To the extent this language implies that Plaintiffs are relying on Defendant's embezzlement as the "wrongful act" under § 523(a)(6), the Court notes that courts have found that embezzlement may serve as the "wrongful act" for § 523(a)(6). *See Wolf*, 577 B.R. at 346 (collecting cases and finding that the debtor's embezzlement may serve as the tort basis for the plaintiff's claim under § 523(a)(6)). As such, the Court will find that Defendant committed a "wrongful act."

However, Plaintiffs not having offered any analysis regarding whether the wrongful act was "done intentionally," "necessarily causes injury," or was committed "without just cause or excuse," the Court will not find that Defendant acted maliciously at this time.  In addition, Plaintiffs have not offered any analysis or evidence that Defendant acted with an intent to injure Plaintiffs, as opposed to with an intent to commit the act in question.  Thus, at this time, the Court also will not find that Defendant acted willfully.

### F.  11 U.S.C. § 727(a)(2)

Section 727(a)(2)(A)-(B) provides that a court shall grant a debtor a discharge unless "the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property ... has transferred, removed, destroyed, mutilated, or concealed ... (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition."

"Two elements comprise an objection to discharge under § 727(a)(2)(A): 1) a disposition of property, such as transfer or concealment, and 2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor...." *In re Beauchamp*, 236 B.R. 727, 732 (B.A.P. 9th Cir. 1999).  Intent may be inferred from the actions of the debtor. *In re Devers*, 759 F.2d 751, 753–54 (9th Cir. 1985).  The necessary intent under § 727(a)(2) "may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir.1986) (quoting *Devers*, 759 F.2d at 753–54).

"The standard for denial of discharge under § 727(a)(2)(B) is the same as § 727(a)(2) (A), but the disposition must be of estate property occurring after the petition date." *In re Miller*, 2015 WL 3750830, at *3 (Bankr. C.D. Cal. June 12, 2015); *see also In re Zhang*, 463 B.R. 66, 78 (Bankr. S.D. Ohio 2012).

**United States Bankruptcy Court**
**Central District of California**
San Fernando Valley
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

Wednesday, October 17, 2018                                    **Hearing Room    301**

2:30 PM
**CONT...        Robin DiMaggio**                                          **Chapter 7**

Plaintiffs assert that the Court should deny Defendant's discharge because Defendant
allegedly concealed: (A) $1.5 million "in income," (B) his interest in Dimagic; (C) the
sale of recording equipment and payments to storage units; and (D) some kind of
interest or arrangement with respect to the Mulholland Property and Defendant's
payments and gifts to his ex-wife.  Plaintiffs also contend that Defendant transferred
his furniture postpetition.

As to Defendant's "1.5 million in income," Plaintiffs have not separated the amounts
Defendant embezzled from any income actually earned by Defendant.  As explained
above, embezzled money does not qualify as earned income. *Wada*, 210 B.R. at
576-77.  For purposes of § 727(a)(2), the limited window is either one year prior to
the petition date or postpetition.  During the entirety of that time, Defendant was
depositing embezzled funds into his accounts.  As such, Plaintiffs have not
demonstrated that, within the time frame set forth by § 727(a)(2), Defendant
concealed actual "income."

With respect to Defendant's interest in Dimagic, it appears Dimagic was active both
pre- and postpetition.  However, Plaintiffs have not demonstrated that Defendant
failed to schedule Dimagic with intent to hinder, delay or defraud creditors of the
estate.  The same is true for the sale of the recording equipment and the payments for
storage.  Plaintiffs did not demonstrate that Defendant failed to schedule these
transfers with intent to hinder, delay or defraud creditors of the estate.

As to the transfer of furniture, Defendant claimed the furniture as exempt and no party
in interest timely objected to Defendant's claim of exemption in the furniture.  As
such, Plaintiffs did not demonstrate that Defendant transferred the furniture with
intent to hinder, delay or defraud creditors of the estate.

Finally, as concerns the Mulholland Property, the purchase of the Mulholland
Property was prior to one year preceding the petition date.  As for the payments
Defendant made on the Mulholland Property, such as taxes and utilities, Plaintiffs did
not meet their burden of proving that Defendant failed to schedule these transfers with
intent to hinder, delay or defraud.  Consequently, Plaintiffs have not met their burden
of proof under § 727(a)(2).

**G.  *11 U.S.C. § 727(a)(3)***

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                              **Hearing Room        301**

2:30 PM
**CONT...        Robin DiMaggio**                                          **Chapter 7**

Section 727(a)(3) places an affirmative duty on the debtor to keep and preserve records accurately documenting his or her business and personal affairs. *See In re Caneva*, 550 F.3d 755, 762 (9th Cir. 2008). Requiring accurate documentation "removes the risk to creditors of 'the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records.'" *Id.* (quoting *Burchett v. Myers*, 202 F.2d 920, 926 (9th Cir. 1953)). We strictly construe this exception to discharge in favor of the debtor's fresh start. *Id.*

To succeed on its objection to discharge under § 727(a)(3), Plaintiffs must show "'(1) that [Defendant] failed to maintain and preserve adequate records, and (2) that such failure rendered it impossible to ascertain [Defendant's] financial condition and material business transactions.'" *In re Cox*, 41 F.3d 1294, 1296 (9th Cir. 1994) (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir. 1992)). Generally, records are sufficient if they allow the court and creditors to trace the debtor's financial dealings. *In re Ridley*, 115 B.R. 731, 733 (Bankr. D. Mass. 1990).

As to their claim under § 727(a)(3), Plaintiffs assert that Defendant did not keep records of his income, such as ASCAP royalties, earnings from France, payments made towards the Mulholland House or records regarding DMI or Dimagic. However, Plaintiffs have not shown that they attempted to obtain such records from Defendant, or that the failure of Defendant to maintain such records has made it impossible for Plaintiffs to ascertain Defendant's financial condition. In light of the extensive banking and corporate records provided to the Court, Plaintiffs were able to subpoena Defendant's pertinent financial records from third parties.

Plaintiffs also assert that Defendant did not document certain transactions, such as the money owed to Defendant by Mr. Romans or income Defendant may have received from the United Nations. However, once again, Plaintiffs did not demonstrate that they attempted to obtain such records from Defendant or that Defendant had any such records. At his deposition, Defendant testified that he was paid cash for the work he did for the United Nations. There is no evidence that Defendant kept records of money owed to him by Mr. Romans.

Finally, Plaintiffs mention Defendant's attempts in state court to alter his financial records and present a false financial picture. However, Defendant did not alter his records in connection with his bankruptcy case, and Plaintiffs were able to obtain a

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

**Wednesday, October 17, 2018**                    **Hearing Room    301**

2:30 PM
**CONT...       Robin DiMaggio**                                        **Chapter 7**

comprehensive picture of Defendant's finances by issuing subpoenas to third parties.
The Court will not enter summary judgment as to Plaintiffs' claim under § 727(a)(3).

### H.  *11 U.S.C. § 727(a)(4)*

Section 727(a)(4)(A) denies a discharge to a debtor who "knowingly and fraudulently"
made a false oath or account in the course of the bankruptcy proceedings.  To bring a
successful § 727(a)(4)(A) claim for false oath, the plaintiff must show: (1) the debtor
made a false oath in connection with the case; (2) the oath related to a material fact;
(3) the oath was made knowingly; and (4) the oath was made fraudulently.  *In re
Wills,* 243 B.R. 58, 62 (B.A.P. 9th Cir. 1999).  "[A] false oath may involve a false
statement or omission in the debtor's schedules."  *In re Roberts*, 331 B.R. 876, 882
(B.A.P. 9th Cir. 2005), *aff'd and remanded on other grounds*, 241 F. App'x 420 (9th
Cir. 2007).

"A fact is material if it bears a relationship to the debtor's business transactions or
estate, or concerns the discovery of assets, business dealings, or the existence and
disposition of the debtor's property." *In re Retz*, 606 F.3d 1189, 1198 (9th Cir. 2010)
(quoting *Khalil*, 379 B.R. at 173).  "A debtor acts knowingly if he or she acts
deliberately and consciously." *Retz*, 606 F.3d at 1198 (quoting *Khalil*, 379 B.R. at
173) (internal quotation omitted).

The fraud provision of § 727(a)(4) is similar to common law fraud, which the Ninth
Circuit Court of Appeals has described as follows:

> The creditor must show that (1) the debtor made the representations;
> (2) that at the time he knew they were false; (3) that he made them with
> the intention and purpose of deceiving the creditors; (4) that the
> creditors relied on such representations; (5) that the creditors sustained
> loss and damage as the proximate result of the representations having
> been made.

*Roberts*, 331 B.R. at 884.  Intent must usually be established by circumstantial
evidence or inferences drawn from the debtor's course of conduct. *Khalil*, 379 B.R. at
174 (circumstances might include multiple omissions or failure to clear up omissions).
"[T]he cumulative effect of false statements may, when taken together, evidence a

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                                   **Hearing Room      301**

**2:30 PM**
**CONT...       Robin DiMaggio**                                                  **Chapter 7**

reckless disregard for the truth sufficient to support a finding of fraudulent intent"
under § 727(a)(4). *Stamat v. Neary,* 635 F.3d 974, 982 (7th Cir. 2011).

As to § 727(a)(4), Plaintiffs assert that Defendant omitted or made a false oath about:
(A) his earnings and income; (B) his ownership of Dimagic; (C) money owed to
Defendant by Mr. Romans; (D) property kept in storage; and (E) certain transfers to
third parties.  Plaintiffs also assert that Defendant falsely testified at his deposition
that he paid Mr. Sterling $500,000 to $1 million and that Dimagic was a new entity.

Regarding Defendant's earnings and income, the Court finds that Defendant made a
false oath as to Defendant's earnings in 2015.  The record demonstrates that
Defendant received $56,626.86 from ASCAP in 2015.  Nevertheless, in his SOFA,
Defendant stated that he earned a combined total of $32,948 in 2015 and 2016.  As
such, Defendant made a false oath about his earnings in his SOFA.  In addition, the
false oath was material because the information has bearing on the size of Defendant's
estate.  As to the other deposits in account, the deposits either originated from
embezzled funds or Plaintiffs have not demonstrated the origin of the funds.  Thus, at
this time, the Court does not find that Defendant falsely stated that he did not "earn"
the rest of the deposits.

The Court also finds that Defendant omitted his ownership interest in Dimagic.
Defendant should have listed Dimagic in his schedule A/B and his SOFA.  The
omission of Dimagic also was material because, as evidenced by Dimagic's corporate
account records, Dimagic held significant funds before and after the petition date.
However, the Court does not find that Defendant made a false oath as his testimony
that Dimagic was a new entity.  Given that Defendant formed Dimagic in 2016,
Defendant's statement that Dimagic was a new entity is vague and not necessarily
false.

Defendant also should have scheduled the money owed to Defendant by Mr. Romans
and listed the $1,400 gift to his friend.  These omissions were material because the
information could have led to the discovery of assets and a recovery of the funds into
the estate.  Moreover, Defendant should have included in his schedules and statements
information about the payments Defendant made to Ms. Rich and/or on the
Mulholland Property.  These omissions also were material as the information could
have led to the discovery of assets or the recovery of the Mulholland Property, or of

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                              **Hearing Room      301**

<u>2:30 PM</u>
**CONT...       Robin DiMaggio**                                           **Chapter 7**

payments made on behalf of Ms. Rich, into the estate.

Further, Defendant's testimony that he paid Mr. Sterling or AEI between $500,000 and $1 million was a false oath.  The record demonstrates that Defendant paid Mr. Sterling and/or AEI a total of $55,000.  Defendant has not otherwise demonstrated that he actually paid Mr. Sterling or AEI more than the $55,000 reflected in the checks to Mr. Sterling and/or AEI.  In addition, this false oath was material because it pertains to Defendant's total liability to Plaintiffs and, as a result, may have an impact on the size of Defendant's estate.

Finally, Defendant omitted information about Defendant's storage unit.  However, Plaintiffs have not shown that these omissions were material.  There is no indication that inclusion of the information could have led to the discovery of additional assets.

As to all of the above, Plaintiffs have not provided any analysis regarding whether the false oaths or omissions were made "knowingly" and "fraudulently."  As a result, the Court will reserve the issue of intent for trial.

### I.   *11 U.S.C. § 727(a)(5)*

Pursuant to 11 U.S.C. § 727(a)(5), a debtor's discharge will be denied if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."  Under § 727(a)(5), the objecting party must demonstrate that:

> (1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets.

*In re Retz*, 606 F.3d 1189, 1205 (9th Cir. 2010).

Plaintiffs assert that Defendant's discharge should be denied because Defendant has not satisfactorily explained the disappearance of assets Defendant bought prior to the petition date, such as electronics, recording equipment, etc.  However, Plaintiffs have

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**  **Hearing Room**  **301**

**2:30 PM**
**CONT...**  **Robin DiMaggio**  **Chapter 7**

not specified which assets Defendant possessed prior to the petition date.  Instead, Plaintiffs vaguely refer to "electronics, furniture, and recording equipment." MSJ, p. 35.  As such, the Court also will not enter judgment on Plaintiffs' claim under § 727(a)(5).

### J. *Damages*

In light of the fact that the Court will enter judgment in favor of Plaintiffs on Plaintiffs' claim of fraud under 11 U.S.C. § 523(a)(2)(A), the Court will award Plaintiffs their actual and consequential damages. *See Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).  The record demonstrates that Plaintiffs suffered actual damages, by transferring funds to Defendant, in the amount of $994,144.  Plaintiffs also suffered consequential damages by incurring costs in reliance on Defendant in the amount of $160,303.08.  The Court will not award Plaintiffs their requested consequential damages arising from payments made to Ms. Saint Clair to secure additional artists, as these payments do not appear to have arisen from Defendant's conduct, or for payments made to Mr. Kourtev, because Plaintiffs do not specify why they paid Mr. Kourtev $25,000.

The Court also will award Plaintiffs prejudgment interest at the federal interest rate. "An award of prejudgment interest in a § 523 proceeding in which the creditor prevails ensures the creditor is made whole and has a full recovery." *In re Del Valle*, 577 B.R. 789, 810 (Bankr C.D. Cal. 2017) (citing *Cohen*, 523 U.S. at 222–23). "Such an award lies within the sound discretion of the bankruptcy court." *Id*. "Awards of prejudgment interest are governed by considerations of fairness and are awarded when it is necessary to make the wronged party whole." *Purcell v. United States*, 1 F.3d 932, 942-43 (9th Cir. 1993). "The federal prejudgment interest rate applies to actions brought under federal statute, such as bankruptcy proceedings, unless the equities of the case require a different rate." *Banks v. Gill Distribution Centers, Inc.*, 263 F.3d 862, 871 (9th Cir. 2001). "Under federal law the rate of prejudgment interest is the Treasury Bill rate as defined in 28 U.S.C. § 1961 unless the district court finds on substantial evidence that a different prejudgment interest rate is appropriate." *United States v. Gordon*, 393 F.3d 1044, 1063 n.12 (9th Cir. 2004).

The Court, in its discretion, declines to apply a rate other than the federal interest rate. Pursuant to 28 U.S.C. § 1941, as of August 26, 2016, the week preceding the

**United States Bankruptcy Court**
**Central District of California**
**San Fernando Valley**
**Judge Victoria Kaufman, Presiding**
**Courtroom 301 Calendar**

---

**Wednesday, October 17, 2018**                                      **Hearing Room      301**

---

2:30 PM
**CONT...      Robin DiMaggio**                                                 **Chapter 7**

September 2, 2016 date of demand, the federal rate was 0.62%.  Applying the 0.62%
federal interest rate on the allowed principal of $1,154,447.08 yields $7,157.57.  The
Court will award Plaintiffs $7,157.57 in prejudgment interest.

The Court will not award punitive damages at this time.  Pursuant to Cal. Civ. Code §
3294(a), punitive damages may be allowed "[i]n an action for the breach of an
obligation not arising from contract, where it is proven *by clear and convincing
evidence* that the defendant has been guilty of oppression, fraud, or malice…."
(emphasis added).  Here, although the Court found that Plaintiffs' claim of fraud is
supported by a preponderance of the evidence, the Court has not found clear and
convincing evidence of fraud.  At this time, without having held trial, the Court will
not award punitive damages under the clear and convincing standard required by Cal.
Civ. Code § 3294(a).

**III. CONCLUSION**

The Court will enter a judgment in favor of Plaintiffs on Plaintiffs' claim under 11
U.S.C. § 523(a)(2)(A) and Plaintiffs' claim of embezzlement under 11 U.S.C. §
523(a)(4).  The Court also will award Plaintiffs $994,144 in actual damages,
$160,303.08 in consequential damages and $7,157.57 in prejudgment interest, for a
total award of $1,161,604.65.

The Court also finds that Plaintiffs have met their burden of proving that Defendants
made the following false oaths, and that the false oaths were material, in accordance
with 11 U.S.C. § 727(a)(4): (A) Defendant made a false oath about his earnings from
2015; (B) Defendant omitted his interest in Dimagic; (C) Defendant omitted a claim
against Mr. Romans; (D) Defendant omitted a gift of $1,400 to a friend; (E)
Defendant omitted payments made to Ms. Rich and/or on the Mulholland Property;
and (F) Defendant made a false oath regarding the amount of money transferred to Mr.
Sterling and/or AEI.  The Court further finds that Defendant omitted information
about a storage unit he used in 2017, but that the omission was not material.  The
Court otherwise denies the MSJ as to Plaintiffs' claim under § 727(a)(4).

The Court denies the MSJ as to Plaintiffs' claims under 11 U.S.C. §§ 523(a)(6) and
727(a)(2), (a)(3) and (a)(5).  The Court also denies the MSJ as to Plaintiffs' claim of
defalcation under 11 U.S.C. § 523(a)(4).  Finally, the Court denies Plaintiffs' request

# United States Bankruptcy Court
## Central District of California
### San Fernando Valley
### Judge Victoria Kaufman, Presiding
### Courtroom 301 Calendar

**Wednesday, October 17, 2018**                              **Hearing Room    301**

2:30 PM
**CONT...        Robin DiMaggio**                                              **Chapter 7**
     for an award of punitive damages.

     Plaintiffs must submit a proposed judgment within seven (7) days.

| Party Information |
|---|

**Debtor(s):**

     Robin  DiMaggio                    Represented By
                                              Moises S Bardavid

**Defendant(s):**

     Robin  DiMaggio                    Pro Se

**Plaintiff(s):**

     Krasimir  Dachev                   Represented By
                                              Matthew A Lesnick

     Peace for You Peace for Me          Represented By
                                              Matthew A Lesnick

     Svilosa AD                          Represented By
                                              Matthew A Lesnick

**Trustee(s):**

     David  Seror (TR)                  Pro Se